**FEDERAL DEPOSIT INSURANCE CORPORATION, in its Corporate Capacity, Plaintiff,**

v.

**V. Edgar STANLEY, Robert Marcuccilli, Judith Stanley, David DeHart, Dan Stanley, Gilbert Bierman, and John Boley, Defendants.**

Civ. No. F 87–325.

United States District Court, N.D. Indiana, Hammond Division.

July 19, 1991.

Charles E. Greer, Fred R. Biewecker, Ice Miller Donadio & Ryan, Indianapolis, Ind., C. Erik Chickedantz, Miller Carson & Boxberger, Fort Wayne, Ind., for plaintiff.

John R. Wilks; Wilks & Kimbrough, Fort Wayne, Ind., for Bierman.

F. Walter Riebenack, Linda J. Peters, Wyss McNellis Riebenack & Myers, Fort Wayne, Ind., for other defendants.

## MEMORANDUM DECISION AND ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court for a decision on the merits following a bench trial. On November 25, 1987, the FDIC filed an action against defendants V. Edgar Stanley, Robert Marcuccilli, Judith Stanley, David DeHart, Wayne Roe [1], Dan Stanley, Gilbert Bierman, and John Boley. In this suit, the FDIC alleged that defendants, from March 1982 through May 1984, while members of the Board of Directors of the Allen County Bank (Bank), breached various fiduciary duties they owed to the Bank in the management, supervision, and direction of the Bank. The FDIC's complaint alleges that as a direct and proximate result of the defendants' breach of fiduciary duties, the Bank suffered substantial losses and impairment of its assets. The complaint further alleges that the FDIC, in its corporate capacity as purchaser and assignee of certain assets of the Bank, has been damaged as a direct result of the defendants' breaches of fiduciary duties. After two years of struggling through a multitude of pre-trial motions, the parties commenced a lengthy and complicated trial before the court on December 6, 1989. Final arguments were heard on May 15, 1990 and on June 6, 1990 and post-trial briefs were filed thereafter. The following Findings of Fact and Conclusions of Law are entered pursuant to Federal Rule of Civil Proce-

---

1. Wayne Roe, originally named by the FDIC as a defendant in this suit, became a Director of the Allen County Bank on August 11, 1981, a position which he held until May 8, 1984. The FDIC and Wayne Roe have settled and Roe is no longer a defendant herein.

dure 52(a), after having carefully reviewed the entire record, which consists of over 2,000 pages of testimony and more than 1,500 exhibits consisting of over 7,500 pages, and after having determined the credibility of the witnesses.

## GENERAL FACTUAL BACKGROUND

Prior to November 22, 1985, the Allen County Bank and Trust Company was a banking institution organized and existing under the laws of the State of Indiana. As a state chartered bank that was not a member of the Federal Reserve System, the Allen County Bank was periodically examined by the FDIC and by the Indiana Department of Financial Institutions (DFI).

On August 19, 1981, the FDIC began an examination of Allen County Bank. Defendants Bierman, Boley, and DeHart were on Allen County Bank's Board of Directors at that time. After examining the Allen County Bank, the FDIC issued a Report of Examination which stated that the Bank's classified assets had risen to 124.2 percent of total capital and reserves, a figure described as "staggering." The report also stated that the Bank's loan portfolio was in a "very serious condition," and that "concerted effort must be made to improve the quality of the loans being placed upon the books." The report concluded that "it is imperative the directorate adequately monitor the lending function."

In October 1981, a special audit of the Allen County Bank was conducted as a result of the discovery that the Bank's president, Vincent Hansen, had been making fraudulent nominee loans. The auditors reported to the Bank's Board of Directors that Hansen had made the loans in violation of the Bank's lending policy, that the loans had not been accurately presented to the Board, and that loans had been made to borrowers with whom Hansen had personal financial dealings.

On February 10, 1982, the FDIC and the DFI entered into a Memorandum of Understanding with the Allen County Bank. The measures agreed to in the Memorandum of Understanding included increasing total capital and reserves by not less than $450,-000, reducing the volume of loans classified substandard by 50 percent within 360 days, and provided detailed loan servicing and collection policies. Defendants Bierman, Boley, and DeHart were members of the Allen County Bank's Board of Directors at the time this Memorandum of Understanding was signed.

During the first nine months of 1982 the Allen County Bank had a net operating loss of $104,000, and on September 11, 1982, the FDIC began examinations of the Allen County Bank, the Leiters Ford State Bank[2], and the Western State Bank[3]. The September 11, 1982 Report of Examination for the Allen County Bank reflected continued deterioration in Allen County Bank's condition, including a substantial increase in classified assets (to over $2.8 million), a loan delinquency rate of over 25 percent, numerous loans unsupported by current credit informaiton, and abusive practices concerning insider loans and fees, including loans to, or for the benefit of, Chairman of the Board F. Walter Riebenack and directors Bierman, DeHart, and Marcuccilli.

The September 11, 1982 FDIC Report specifically criticized the Allen County Bank's past lending practices, including "overlending, poor selection of risk, incomplete credit information, self-dealing, failure to establish or enforce liquidation agreements, and lack of supervision." The Report also noted that little or no credit information was maintained for many commercial loans, including "participation loans purchased from affiliated banks." The results of the Allen County Bank examination were discussed in a meeting be-

2. In 1974, Ed Stanley, Judy Stanley, and David DeHart purchased a controlling interest in Leiters Ford State Bank from Wayne Roe. Ed Stanley was then named President of Leiters Ford State Bank. During the period from March 1982 through May 1984, Ed Stanley, Judy Stanley, and David DeHart owned approximately 70 percent of the outstanding shares of Leiters Ford State Bank.

3. In December 1981, Ed Stanley, Judy Stanley, Robert Marcuccilli, Wayne Roe, and David DeHart purchased an interest in Western State Bank, located in South Bend, Indiana.

tween the FDIC and the Bank's Board of Directors on October 5, 1982. The formal written Report of Examination was transmitted to the Bank's Board of Directors by letter of November 18, 1982. This letter refers to the "continued deterioration of the bank's condition" and concludes that, "The Board would be well advised to act promptly to effect resolution of all problem areas noted above."

On February 22, 1983, the FDIC and the DFI entered into a second Memorandum of Understanding with the Allen County Bank. Among other things, the Allen County Bank agreed to reduce assets classified substandard by $600,000 by June 30, 1983, and by an additional $600,000 by December 31, 1983. The Bank also agreed to implement an amended written loan policy, acceptable to the regulators, by March 31, 1983.

On November 22, 1985, the DFI initiated liquidation proceedings against the Allen County Bank pursuant to I.C. § 28–1–3.1–1 *et seq.* The Bank was closed on that same date and the Allen County Superior Court confirmed the appointment of the FDIC as receiver of the Bank, pursuant to I.C. § 28–1–3.1–5. On November 22, 1985, the FDIC as receiver of the Bank, pursuant to I.C. 28–1–3.1–7 and 12 U.S.C. § 1823(c)(2)(A), entered into an agreement under which it sold certain assets of the Bank to the FDIC in its corporate capacity. Among the assets purchased by the FDIC in its corporate capacity were all claims against directors, officers, or employees of the bank arising out of any act or acts of any such persons in respect to the Bank or its property, by virtue of non-performance or manner of performance of their duties.

The FDIC, in its corporate capacity, acquired the loans and leases at issue in this case. The FDIC claims that these loans and leases, which were participated in or made directly by the Allen County Bank, were inappropriate and involved other banks owned and operated by the inside directors. The loans and leases at issue are as follows:

(a) Abbott Coal and Energy Co.;

(b) Edward E. and Linda L. Carper d/b/a Ed Carper & Sons;

(c) James and June Conn;

(d) DeVries Hog & Grain Farms, Inc.;

(e) Leonard and Eileen Diamond;

(f) M & M Designers, Inc.;

(g) Pinkerton Farms, Inc; and

(h) Powell Implement, Inc.

The individual defendants in this case served on the Allen County Bank's Board of Directors at various times. Some of the defendants were also officers of the Allen County Bank and some of the defendants served in various capacities as officers/directors of Leiters Ford State Bank, Counting House Bank, and/or Western State Bank.

Defendant V. Edgar (Ed) Stanley was a member of the Board of Directors of Allen County Bank from March 24, 1982, through May 22, 1984. Ed Stanley also served as President of Allen County Bank from March 24, 1982, through September 13, 1983. Defendant Robert Marcuccilli was a member of the Board of Directors of Allen County Bank from March 24, 1982, through May 22, 1984. Defendant Judith Stanley became a member of the Board of Directors of Allen County Bank on March 24, 1982, a position which she held until May 8, 1984. Defendant David DeHart became a member of the Board of Directors of Allen County Bank on August 11, 1981, a position which he held until May 8, 1984. Defendant Dan Stanley became a member of the Board of Directors of the Allen County Bank on or about May 25, 1982, a position which he held until May 8, 1984. Defendant John Boley was a member of the Board of Directors of Allen County Bank from 1970 through June 16, 1983. At one time, John Boley also served as Secretary to the Board. John Boley attended one Allen County Bank Board meeting between November 9, 1982, and his resignation in June of 1983. Defendant Gilbert Bierman was a member of the Board of Directors of Allen County Bank from May 1978 through April 9, 1984[4]. In 1982, the primary ownership interest in the bank was sold from

---

**4.** Gilbert Bierman had an ownership interest in the Allen County Bank of 4117 shares.

its then present owners to Ed Stanley and related individuals. Stanley advised Bierman that Bierman no longer had to come to any meetings of the Board of Directors but wished that Bierman's name could still be affiliated with the bank for purposes of continuity and credibility as Bierman was a noted orthopedic surgeon. Gilbert Bierman attended no Allen County Bank Board meetings after October 5, 1982. During the time defendants were Directors of Allen County Bank, they were all also shareholders of Allen County Bank. During the period from approximately May 1982 through May 1984, defendants Ed Stanley, Robert Marcuccilli, Judith Stanley, David DeHart, Wayne Roe, and Dan Stanley owned, at various points in time, approximately 40 to 46 percent of the outstanding shares of Allen County Bank.

From March 1982 through May 1984, defendants Ed Stanley, Judith Stanley, David DeHart, and Wayne Roe served concurrently as Directors of Allen County Bank, Leiters Ford State Bank, Counting House Bank [5], and Western State Bank. Robert Marcuccilli served concurrently during this period as a director of Allen County Bank, Counting House Bank, and Western State Bank. Marcuccilli also served as a Director of Leiters Ford State Bank until January 1983. Marcuccilli was also Chairman of the Board of Counting House Bank from March 1982 through May 1984.

## A. *Abbott Coal and Energy Company*

■ Abbott Coal and Energy Company was a partnership which operated a coal mine in southern Indiana and had offices in Louisville, Kentucky. The Abbott Coal partnership had four partners, Robert Goldman, William Gladstone, Charles Curry, and John Swets. During the time period relevant to this litigation, the Allen County Bank had entered into two transactions involving Abbott Coal.

First, on December 30, 1982, Allen County Bank was assigned without recourse an installment lease in the amount of $130,484.00 between Northern Indiana Leasing, Inc. and Abbott Coal and Energy Company. Abbott Coal's lease, which the Allen County Bank purchased, was secured by a bulldozer [6]. Northern Indiana Leasing [7] had purchased the bulldozer on December 30, 1982 from Clark Machinery Corporation, of which Mr. Curry was president, for $95,500 [8]. Northern Indiana Leasing then sold

---

**5.** In May 1980, Ed Stanley, Judy Stanley, Robert Marcuccilli, David DeHart, and Wayne Roe purchased an interest in Counting House Bank, located in Warsaw, Indiana. The approximate purchase price was $1.8 million, and the purchase was financed by a loan from Northern Trust Bank of Chicago. These five persons owned 100 percent of the stock of a one-bank holding company, Northwest Indiana Bancshares, Inc., which in turn owned approximately 81 percent of the outstanding shares of Counting House Bank at all relevant times. Ed Stanley served as President of Counting House Bank from March 1982 through September 1983.

The Stanley/Marcuccilli group owned 45 percent of the stock of Allen County Bank, as opposed to 78 percent of the stock of Leiters Ford State Bank and over 80 percent of the stock of Counting House Bank. From March 1982 through May 1984, Ed Stanley and Judy Stanley owned approximately 8.5 percent of the outstanding shares of Allen County Bank, compared to over 38 percent of the Leiters Ford Bank shares and over 20 percent of the Counting House Bank shares.

**6.** Specifically, the collateral for the lease was a Fiatt Allis HD41B # 75SO3282 bulldozer with enclosed cab and 41R ripper.

**7.** FDIC claims that Northern Indiana Leasing was an "affiliate" of Counting House Bank. The defendants dispute this characterization of Northern Indiana Leasing. With regard to the status of Northern Indiana Leasing, the court notes that the evidence presented at trial shows that Robert Marcuccilli and Ed Stanley were both listed as Vice–Presidents of Northern Indiana Leasing on several documents prepared by Northern Indiana Leasing and that Marcuccilli, on behalf of Northern Indiana Leasing, signed the lease agreement between Northern Indiana Leasing and Abbott Coal. Marcuccilli was also Chairman of the Board of Counting House Bank from March 1982 through May 1984. Furthermore, in portions of FDIC's Report of Examination, dated January 2, 1985, Northern Indiana Leasing is described as an "affiliate of Counting House Bank of Warsaw."

**8.** V. Edgar Stanley testified that Northern Indiana Leasing had paid an additional $19,500 down on the bulldozer, bringing the total purchase price to $115,000. However, Mr. Stanley's testimony was not credible as the Bill of Sale plainly indicates that zero dollars were paid down and that the purchase price was $95,000.

the lease to Allen County Bank for the net amount of $110,500. The second transaction occurred on February 12, 1983, when the Allen County Bank purchased, in full, a $60,000.00 commercial loan to Abbott Coal from the Counting House Bank. This loan was for the stated purpose of purchasing two Cat loaders.

Prior to purchasing the Abbott Coal lease and the Abbott Coal loan, the Allen County Bank had been involved in only one coal-related loan—to Hartman Construction Company—which had been written off as a loss of $39,682.00 on the September 1982 FDIC Report of Examination. With this recent unprofitable experience with coal-related loans fresh in mind, Allen County Bank should have been hesitant to become involved with Abbott Coal in the absence of a strong earnings record. However, this was not the case. As the evidence presented at trial showed, when the Allen County Bank purchased the Abbott Coal lease and loan, Abbott Coal's financial condition was very poor.

On November 11, 1982, Churney and Counts, a CPA firm located in Louisville, Kentucky, compiled a balance sheet and related statement of operations for Abbott Coal and Energy Co. as of September 30, 1982. This unaudited compilation was limited to presenting, in the form of financial statements, information that was the representation of management. Far from showing a strong earnings record, Abbott Coal's statement of operations for the nine months ended September 30, 1982 showed a net loss of $553,699.00. Abbott Coal's balance sheet as of September 30, 1982 showed $15.00 cash on hand and a total of $229,462.00 in current assets. Fixed assets, less depreciation, totaled $1,233,644.00 and other assets totaled $1,006,627.00, with $996,752.00 of the total other assets consisting of "notes receivable." On the other side of the balance sheet, Abbott Coal had $170,507.00 in current liabilities including a $44,842.00 bank overdraft. Abbott Coal also had long-term debt in the amount of $1,595,117.00. Partners' equity was listed as $695,109.00.

Clearly, even this unaudited financial information showed that Abbott Coal was a poor candidate for a loan or a lease. The company had been suffering significant operating losses throughout the year and already had a high degree of long-term debt with few current assets with which to service the debt. Furthermore, a comparison of Abbott Coal's September 30, 1982 balance sheet with its July 31, 1981 balance sheet shows that Abbott Coal had run into severe financial difficulties during the ensuing year. First, on July 31, 1981, Abbott Coal had a long-term debt (less current maturities) of only $330,890.00, while on September 30, 1982, Abbott Coal had long-term debt in the staggering amount of $1,594,117.00. This indicates that Abbott Coal was operating on borrowed funds rather than on operating income. Second, although total assets on September 30, 1982 were $2,459,733.00, while total assets were only $1,876,505.00 on July 31, 1981, nearly $1 million of the September 30, 1982 assets were in the form of "notes receivable" with no indication of Abbott Coal's ability to collect on the notes mentioned anywhere in the 1982 financial statements. Third, Abbott Coal's partners' equity had been cut nearly in half from July 31, 1981, when partners' equity was $1,234,788.00 to September 30, 1982 when partners' equity was only $695,109.00. Obviously, on December 30, 1982, Abbott Coal did not appear to be a prosperous company with the ability to meet payments on a new lease or loan.

At first glance, the balance sheets of two of Abbott Coal's partners, Robert Goldman and William Gladstone [9], appear reassuring. On September 2, 1982, Robert Goldman's balance sheet showed a total net worth of $1,515,300.00. However, upon closer observation, Goldman's balance sheet appears to be misleading in several respects. First, $750,000.00 in assets is attributed to Goldman's interest in Abbott Coal and Energy. It is noted that on Sep-

9. Financial information on the two other Abbott Coal partners, Mr. Curry and Mr. Swets, was not submitted into evidence.

tember 30, 1982, total partners' equity in Abbott Coal was $695,109.00. Thus, the $750,000.00 figure is totally unrealistic. Second, the two other major assets listed, Nixon–Trust tapes at $320,000.00 and Hubco Gas and Oil at $250,000.00, are not explained with any supplemental documentation. Finally, Mr. Goldman does not claim to have any liabilities other than utilities and insurance totaling $3,700.00. Although Mr. Goldman has included his interest in Abbott Coal as an asset, he has failed to include his share of Abbott Coal's liabilities in the liabilities section of his balance sheet. Thus, Mr. Goldman's net worth on his September 2, 1982 balance sheet was obviously grossly overstated.

William Gladstone's balance sheet of December 31, 1981 [10] suffers similar deficiencies. Although Gladstone listed his net worth as $1,695,000.00, he claims his net worth equals his assets. His assets include $500,000.00 for his interest in Abbott Coal and $300,000.00 for "Oil and Gas". The "Oil and Gas" item is not supported by any documentation. Incredibly, Gladstone's balance sheet does not list *any* liabilities. However, Gladstone's balance sheet does list a $2,000,000.00 contingent liability with Liberty National Bank on Abbott Coal. Nevertheless, Gladstone, like Goldman, had overstated his net worth on the balance sheet which he submitted to Allen County Bank to support the contention that his partnership should be extended further credit. After reviewing this evidence, the court agrees with the testimony of Don Imel, a bank examiner for the FDIC, that a prudent banker would not have given these financial statements any credibility without some supporting information and documentation to support the values on the financial statements. Thus, Goldman's and Gladstone's financial statements do not support the defendants' contentions that Abbott Coal had the ability to service any new debt [11].

The next question that arises is whether Abbott Coal's payment history on the lease in question shows that Abbott Coal did in fact have sufficient cash flow to pay off the lease. The defendants point out that Abbott Coal made payments on the lease up to and including the March 15, 1984 payment and brought the lease balance down from $130,484.40 to $58,507.78. Plaintiff, however, notes that in March 1983, less than three months after the assignment of the lease to the Allen County Bank, Abbott Coal defaulted. Plaintiff claims that Abbott Coal made only sporadic payments after March 1983. A review of the evidence shows that Abbott Coal made twelve payments of $5,436.85, as well as one payment of $5,075.00 and one payment of $1,659.42. Although Abbott Coal did not always make its scheduled payment in a timely manner, on those occasions when it did skip a monthly payment it would usually make two payments in the next month. Thus, while the payments were not exactly regular they were not sporadic either.

Nevertheless, it is clear that Abbott Coal defaulted on the lease. To remedy this situation, on March 12, 1983 the Allen County Bank sent a demand letter to Ab-

---

**10.** Incredibly, Mr. Gladstone's January 1, 1983 balance sheet is identical to his December 31, 1981 balance sheet.

**11.** Defendants also claim that additional documentation of Abbott Coal, Goldman, and Gladstone's credit history was requested by the Allen County Bank and the Bank was supplied with letters of credit issued by Liberty National Bank of Louisville and Merchants National Bank and Trust of Indianapolis. Defendants further claim that several of these letters of credit were issued after the loan and lease were purchased by the Bank in December 1982 and February 1983.

To support their contentions, defendants submitted seven letters of credit into evidence.

These letters of credit were dated as follows: 9–5–79, 11–2–79, 6–5–80, 3–22–82, 4–13–82, 7–1–82, and 3–28–83. While these letters of credit show that Abbott Coal was able to obtain credit in amounts ranging from $15,000 to $50,000, there is no indication that Abbott Coal ever used these lines of credit or whether it was able to repay any indebtedness it did incur under these lines of credit. Further, only one letter of credit was issued after December 1982, contrary to defendants' contentions that several were issued after that date.

Taken together, the court finds that the letters of credit carry little weight to support defendants' contentions that they investigated the credit history of Abbott Coal.

bott Coal declaring Abbott Coal to be in default for missing a scheduled payment. Apparently, Abbott Coal was also in default on its loans to Western State Bank and Counting House Bank. On March 14, 1983, Robert Goldman, on behalf of Abbott Coal, and Robert Marcuccilli, on behalf of Counting House Bank, entered into an agreement called a Memorandum of Understanding. This Memorandum provided in pertinent part:

In reply to the telephone conversation of March 12, 1983 between Counting House Bank, and Robert Goldman it is mutually agreed:

1. That Abbott Coal and Energy— Louisville Ky has various loans due to Allen County Bank—Leo, Indiana, Western State Bank—South Bend, Indiana— and Counting House Bank—Warsaw Indiana, and said loans are presently in default.

2 That said banks have a security interest in various equipment & proceeds & products of Abbott Coal & Energy Co.

3. That said banks presently have put Indianapolis Power and Light Company on notice of their interest in the proceeds of any and all funds due Abbott from Indianapolis Power.

4. That Mr. Goldman, a general partner of Abbott, is willing to provide his personal guaranty and the guaranty of his wife to each of the above mentioned lenders, to assure repayment of said loans.

5. That Mr. Goldman, will provide a Certified Check to Counting House Bank for $26,000.00 on 3/14/83. Said funds will be applied as follows:

a) 2 Payments each to Allen County Bank for the lease payments due February 15th, 1983, and March 15, 1983 ... $10,873.70.

\* \* \* \* \* \*

7. That all parties agree that in the event of any future default by Abbott said lenders shall present a copy of this memorandum to the Indianapolis Power and Light Company and this shall constitute an assignment of any proceeds due Abbott and shall authorize Indianapolis

Power to remit to lenders any funds due Abbott, and hold Indianapolis Power harmless for same.

8. That the lenders will withdraw the letters of Demand presented through counsel for the past default.

9. That upon receipt of the $26,000.00 that the above Lenders will notify, by telegram, Indianapolis Power that the lenders release any present claim on the funds due Abbot [sic] Coal and Energy.

The Allen County Bank did, in fact, receive money directly from Indianapolis Power and Light Company. The evidence also shows that on March 14, 1983, Mr. and Mrs. Goldman signed a loan guaranty agreement in which they agreed to jointly and severally guarantee credit extended to Abbott Coal by the Allen County Bank to the extent of $100,000.00.

In early 1984, the Small Business Association (SBA) approved a $450,000 loan to Abbott Coal. Prior to approving this loan the SBA performed its own investigation of the financial position of Abbott Coal and its principals and examined the company's cash flow and apparently found them to be creditworthy. Mr. Hadden, a loan officer at the SBA office in Indianapolis, Indiana, and Mr. Marcuccilli took a trip down to the Abbott Coal mine in order for Mr. Hadden to view the mine and to determine the extent of Abbott Coal's capabilities. Subsequently, the SBA issued a 90 percent guarantee of a $450,000.00 loan to Abbott Coal from the Counting House Bank.

The bulldozer which secured the Allen County Bank's lease was not adequate collateral to insure payment on the lease. First, it was unwise for the Allen County Bank to secure a lease with a piece of heavy equipment which was to be used in a coal mining operation in the southernmost reaches of Indiana. Prudent banking practices mandate that a lending bank's collateral be located in the same geographic area as the bank so that the collateral can be monitored. In this regard, the FDIC presented credible testimony that bulldozers are not a good form of collateral because they depreciate rapidly and, as they are normally kept at the mining or con-

struction site with little or no security, bulldozers are subject to vandalism and theft.

At the time the bulldozer lease was purchased by the Allen County Bank, a similar lease was purchased by the Western State Bank. Abbott Coal was the lessee on both of these leases. When Abbott Coal filed bankruptcy, Western State Bank and Allen County Bank jointly retained counsel, Mr. Jay Jaffe, to obtain abandonment orders with regard to the bulldozers. Once abandonment was obtained, Western State Bank immediately began trying to sell its bulldozer and after approximately two to three months, sold it for $61,000.00. The principal balance on the Allen County Bank's bulldozer in October of 1984 was approximately $58,000.00. Defendants contend that if the Harris Board of the Allen County Bank had exercised the same diligence as the Western State Bank, then the Allen County Bank would have been able to sell its bulldozer for approximately $60,-000.00 with no loss of principal. Defendants conclude that because the Allen County Bank, under the guidance of the Harris Board, did not protect its interest in the bulldozer, it was subsequently sold to Coal Age Mining for only $12,000.00 when the bank had previously been offered $40,-000.00 for the bulldozer.

A review of the evidence shows that Western State Bank sold its bulldozer for $61,000.00. Western State Bank's bulldozer was sold to Mr. Charles Curry, a partner in Abbott Coal, who had initially sold both of the bulldozers to Northern Indiana Leasing, who then leased them to Abbott Coal. Mr. Curry was provided 100 percent financing and zero percent interest as part of a restructuring of Mr. Curry's debt at Counting House Bank. Mr. Curry was subsequently released from Abbott Coal's debts.

The November 1, 1985 FDIC Report of Examination, in discussing Charles and Cynthia Curry's indebtedness to the Counting House Bank in the section entitled "Assets Subject to Adverse Classification," states that "$62,000 was disbursed to the affiliated Western State Bank, this being the portion of the loan at zero interest rate.

These funds were used to pay-off the remaining balance on a loan on a dozer to Abbott Coal who had filed bankruptcy." Thus, Counting House Bank loaned Mr. Curry $62,000 which was used to pay off Abbott Coal's bulldozer lease which Western State Bank had purchased on December 30, 1982. The FDIC Report further states that "Mr. Curry was also a former partner in a business known as Abbott Coal and Energy which was adversely classified at the January and September 1984 examinations. Mr. Curry was released from liability on that debt in March 1984 by former chairman Marcuccilli."

On cross-examination during the trial, Ed Stanley admitted that the FDIC Report's reference to a bulldozer was reference to the bulldozer that secured Western State Bank's lease to Abbott Coal. Ed Stanley denied that the $62,000 loan to Mr. Curry was at zero percent interest rate. However, nowhere in the evidence is there any other indication that the interest rate on this loan was something other than zero percent. Further, Ed Stanley admitted that Mr. Curry was released from the Abbott Coal debt.

The fact that the Counting House Bank loaned Mr. Curry the money to pay off Abbott Coal's bulldozer lease at the Western State Bank, and that Mr. Curry was then released from liability on this debt, does not necessarily establish that the sale of Western State Bank's bulldozer was a "sham." However, the sale of Western State Bank's bulldozer to Mr. Curry can hardly be considered a "comparable sale" for purposes of determining the price range within which the Allen County Bank should have been able to dispose of its bulldozer if the Harris Board had exercised due diligence in securing a buyer. Thus, the defendants' evidence that the Western State Bank sold its bulldozer for $61,000.00 is given no weight by this court.

The defendants have also claimed that the Allen County Bank was offered $40,000 for its bulldozer, but due to lack of diligence of the Harris Board, the sale was not consummated. In analyzing this contention, it is helpful to trace the chronology

of events leading up to the eventual sale of Allen County Bank's bulldozer for $12,000.00.

Abbott Coal filed Chapter 11 bankruptcy on or about June 25, 1985 in the United States Bankruptcy Court for the Western District of Kentucky at Louisville. However, on October 2, 1985, an agreed order was entered in Abbott Coal's bankruptcy proceeding lifting the automatic stay on the bulldozer and surrendering possession of the bulldozer to the Allen County Bank. Previously, on August 27, 1984, William F. Clarkson, III, President of Clarkson Equipment Co., submitted an offer to purchase the bulldozer to Jerry K. Conrad, then president of Allen County Bank. Clarkson submitted a proposed purchase price of $40,000 amortized over a ten-year period at a 12 percent fixed rate with a five-year balloon payment, with the first payment to be due on December 1, 1984.

On October 19, 1984, Robert Marcuccilli contacted Donald G. Richards of the Allen County Bank. Marcuccilli advised Richards to not accept the long-term offer from Mr. Clarkson. Marcuccilli further advised Richards to keep the equipment, advertise it and sell it direct. On October 29, 1984, Mr. Clarkson informed Mr. Jay Jaffe, joint counsel for the Counting House Bank and the Allen County Bank, that the Clarkson Company was no longer interested in the Allen County Bank's bulldozer. Clarkson stated that "The decision is due to the indecisiveness of Allen County Bank to contact me and the Companies [sic] need for immediate use of a dozer forced us to move ahead on another piece of equipment."

On February 27, 1985, Rich Equipment Co. appraised the value of the bulldozer at $20,000–$22,000 "as is", and at $33,000–$35,000 "with repairs." Also on February 27, 1985, Bryant Equipment, Inc. appraised the value of the bulldozer as follows: wholesale price, $15,000–$20,000; retail price, $20,000–$25,000; auction price, $20,000–$22,000; auction preparation approximately $3,000; auction commission approximately 8 percent.

Thus, prior to Abbott Coal's bankruptcy, Marcuccilli was advising the Allen County Bank not to sell the bulldozer for $40,000.00, under a long-term payment schedule. A few months later, the bulldozer was appraised at values ranging from $15,000.00 to $35,000.00. Eight months later, the bulldozer was sold for $12,000.00, a price close to the bulldozer's appraised values. This evidence simply does not support the defendants' contention that Allen County Bank's loss on the bulldozer was a result of inaction by the Harris Board. Clearly, as the Allen County Bank should have predicted, the bulldozer had depreciated rapidly while in use at the Abbott Coal mine. Any loss suffered by the Allen County Bank on its lease to Abbott Coal was a result of the Bank's earlier act of taking insufficient collateral.

In Allen County Bank's second transaction with Abbott Coal, the Allen County Bank purchased, from the Counting House Bank, a $60,000.00 commercial loan to Abbott Coal. The original loan application, dated February 12, 1983, stated that the purpose of credit was "Business Operating Capital to purchase equipment" and listed the following as collateral for the loan: 1976 Caterpillar 988 Loader, Serial Number # SN87A7407, 6½ yd bucket; 1975 Michigan 275 Loader, Serial # 425A195–CAC, 6½ yd bucket.

Exhibit A to the Abbott Coal partnership agreement, dated October 1, 1982 lists equipment owned by the partnership, and item No. 1, a Michigan 275 loader, and item No. 10, a Cat 988 loader, are the same loaders that the defendants claim were purchased with this loan. On cross-examination, Ed Stanley admitted that the collateral listed on the February 12, 1983 loan application was already owned by Abbott Coal as early as October 1, 1982 and that the loan could not have been a purchase money loan.

A review of the evidence shows that both loaders were subject to a blanket lien asserted by Leasing Service Corporation and duly perfected in July 1981. Liberty National Bank also had a lien on both loaders, filed in November 1982. The first filing of record for the Counting House Bank on the loaders was a security agreement filed on

March 1, 1983. When Abbott Coal filed bankruptcy in 1985, Leasing Service Corporation, by an Agreed Order, was granted the possession of both loaders. As Mr. Jay Jaffe, counsel for the Counting House Bank in the bankruptcy proceedings, stated in a letter to Allen County Bank, "Given the two prior filings, and no other supporting documentation, it was quite impossible to argue that Counting House Bank had a purchase money security interest in these items of equipment." Clearly, considering the complete lack of collateral to secure Abbott Coal's $60,000.00 loan, a reasonable and prudent banker, in an arm's length transaction would not have purchased this loan [12].

### EDWARD AND LINDA CARPER, d/b/a ED CARPER & SONS

■ Edward and Linda Carper operated a dairy farm, under the name of Ed Carper & Sons, in Corunna, Indiana. On April 26, 1983, Mr. Fred Plantz, president of Northern Indiana Leasing, presented the Allen County Bank's Board of Directors the opportunity to purchase the Carper lease, which Northern Indiana Leasing was considering entering into. The Carper lease, as presented to the Board of Directors, was to be in the amount of $20,000 for 36 months at an interest rate of 17%. The purpose of the lease was to enable the Carpers to purchase 21 head of dairy cattle. Mr. Marcuccilli motioned to approve the loan and Mr. DeHart seconded the motion.

On July 14, 1983, Northern Indiana Leasing and Ed Carper entered into a lease agreement whereby Northern Indiana Leasing leased 21 Holstein dairy cows to Ed Carper for a period beginning July 14, 1983 and ending September 15, 1987. Ed Carper agreed to pay Northern Indiana Leasing $718.32 per month for 48 months,

with the first payment due on September 5, 1983. On July 25, 1983, Northern Indiana Leasing assigned the Carper lease to the Allen County Bank without recourse.

The Carpers made regular monthly payments of $718.32 on the lease through August, 1984. However, on October 15, 1984, the Carpers filed a voluntary petition for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Northern District of Indiana. On November 4, 1987, the bankruptcy court approved the Carper's Amended Plan of Reorganization and on November 18, 1987, the Carpers paid the FDIC $2,625.00 as payment in full on the Chapter 11 plan.

Although the FDIC recovered $2,625.00 from the Carpers on its claim in the Carper bankruptcy, the FDIC seeks to recover, from the defendants, the total principal and interest losses on the Carper lease through December 6, 1989 in the amount of $21,421.46, with a per diem interest rate of $4.06 to the date of judgment. The FDIC also seeks to recover the Allen County Bank's expenses of $416.25 and FDIC legal fees in the amount of $5,615.00.

The evidence clearly shows that the lease constituted 100% financing of the 21 head of dairy cattle which were the primary collateral for the lease. However, the Allen County Bank and Northern Indiana Leasing investigated Carper's financial position which indicated that Carper had the ability to make payments on the lease, and there was ample collateral securing the lease in which the Allen County Bank's interest had been perfected.

It is not uncommon for banks in rural areas to give 100% financing on cattle, as a herd of dairy cattle is an income producing asset. Northern Indiana has many successful dairy farms, and Carper's dairy farm, located in Corunna, Indiana (DeKalb County) is situated well within Allen Coun-

---

**12.** Defendants do not contest that fact that the loan was unsecured at the time the Allen County Bank purchased the loan. Defendants claim, however, that the loan was a "good" loan when made because from March 3, 1983 to May 3, 1984 the principal amount of the $60,000.00 loan was reduced to $38,000.00. While it is true that Abbott Coal made substantial payments on this loan, the fact remains that the loan was unsecured, Abbott Coal filed bankruptcy, and the Allen County Bank suffered a loss of $38,000.00 There is no doubt that a prudent banker would not have purchased this loan, especially considering Abbott Coal's poor financial health at the time the loan was purchased.

ty Bank's lending area, such that the Bank could readily monitor its collateral.

Schedule F of Carper's 1980 income tax return, detailing Carper's farm income and expenses for the year, shows a net farm loss of $5,730.99. Carper's 1981 tax return showed a net farm loss of $6,910.00. And Carper's 1982 tax return showed a net farm loss of $917.89. The FDIC notes that Carper's interest expense jumped from $620.48 in 1981 to $13,196.22 in 1982.

In 1980 Carper was not yet in the dairy business and earned only $1,733.26 for farm related work, plus $160.00 from the sale of honey. However, in 1980 Carper incurred $7,624.25 in expenses for supplies, interest, depreciation and livestock hauling. Defendants claim that the proper way to assess Carper's financial position for 1980 is to disregard depreciation and interest expense, leaving Carper with a loss of only $3,634.50 for 1980. 1981 was Carper's first year in the dairy business and he showed a taxable loss of $6,910.00 for that year. Defendants contend that Carper's loss was actually only $753.52, after disregarding depreciation and interest expense. 1982 was Carper's first full year of milking production and he showed a taxable loss of $917.89. Again, defendants insist that interest expense and depreciation for 1982 should be disregarded, leaving Carper with $21,202.89 in net farm income for 1982.

Although Carper's farm related expenses cannot be completely disregarded, these expenses should not be allowed to obliterate the fact that Carper's gross farm profits increased from $1893.26 in 1980 to $31,211.10 in 1981, and to $45,334.36 in 1982. Furthermore, Carper was clearly improving his overall financial condition at a rapid rate, even though he showed a net loss for tax purposes in each of the three years.

Carper's personal financial statement on February 15, 1983 indicates that he had a net worth in excess of $76,000 [13]. Carper's only liquid asset was a cash balance of $100.00 and the balance sheet indicated a debt-to-net worth ratio of 1.63 to 1 [14].

Although at the time of purchasing the Carper lease the defendants realized that Carper's balance sheet and tax returns showed that Carper was not yet financially strong, the defendants nevertheless believed that Carper had the ability to run his dairy farm successfully and meet his financial obligations. Ed Stanley testified that, in reviewing Ed Carper's financial statements, he felt it to be significant that a large portion of Carper's debt ($82,000.00) was long-term debt in the form of real estate loans. Mr. Carper's other primary creditor was Lincoln National Bank, to whom Carper owed approximately $45,000.00. Mr. Carper incurred this debt in 1982 to purchase 26 head of dairy cows. Ed Stanley testified that the Board of Directors looked favorably on the fact that Mr. Carper's financial statement reflected that he did not have a lot of debt to service other than debt on income-producing assets.

With regard to collateral, the Allen County Bank had a security interest in the 21 Holstein dairy cattle which were the subject of the lease. This security interest was perfected by filing UCC's in the DeKalb County Recorder's Office on July 26, 1983, on the cattle as well as on the products and proceeds therefrom. As further security, the Allen County Bank took an interest in Mr. Carper's silo, auger, pipeline, and bulk milk tank on July 14, 1983. In September, 1983, Northern Indiana Leasing filed UCC's on the equipment, listing the Allen County Bank as "Assignee of Secured Party," with both the DeKalb County Recorder's Office and the Secretary of State. Unknown to the Allen County Bank, the silo had a prior filing on it, but

---

**13.** Upon reviewing Carper's financial statement as of February 15, 1983 (Plaintiff's Exhibit 134), the court notes that Carper improperly filled out the statement. Schedule D of the statement lists a herd of 26 dairy cows as an asset, valued at $28,000.00. However, Carper failed to include the $28,000.00 value of the herd as an asset on the summary page (balance sheet) of the financial statement. Adding $28,000.00 as an addi-

tional asset to Carper's balance sheet increases Carper's net worth to $104,387.00.

**14.** If Carper's balance sheet had included Carper's herd of dairy cows as an asset, valued at $28,000.00, then Carper's debt-to-net worth ratio would have been 1.19 to 1.

apparently the other equipment did not have any prior filings.

The Carper lease was secured to some extent by a dairy assignment with County Line Cheese Co., Inc., located in Auburn, Indiana, which buys milk from dairy farmers and markets a variety of dairy products. In an agreement dated July 14, 1983, Ed Carper authorized County Line Cheese (or any other buyer) to deduct the sum of $718.32 each month from sums otherwise due for milk marketed, to be paid to the Allen County Bank. By the terms of this dairy assignment, it was irrevocable. The Allen County Bank received payments from County Line Cheese pursuant to this dairy assignment through August of 1984. However, in a memorandum to the Carper credit file dated August 29, 1984 it was noted that:

> Barb Kingsley of County Line Cheese informed Loan Dept. that Carper cancelled automatic payment to Bank by Company on 8–9–84. We no longer are receiving checks. A review of the file does not show an assignment of milk proceeds was taken as collateral. The account is current at this point and due for 9–5–84.

Thus, Carper unilaterally revoked the "irrevocable" dairy assignment.

The Bank required Mr. Carper to purchase credit life insurance in the principal amount of the lease, $34,479.36. The lease also required Mr. Carper to maintain insurance on the cattle with the Allen County Bank named as an additional insured.

After reviewing all the evidence presented to the court, the court finds that the defendants were not negligent in purchasing the Carper lease. The defendants had investigated Carper's financial history prior to making the purchase of the lease. Although purchasing the lease entailed a fairly high degree of risk due to Carper's recent losses and the fact that he was starting a new business, the court finds that the defendants' act of exposing the Bank to this degree of risk did not approach the level of negligence. This finding is fully supported by the fact that the Bank had an interest in the cattle as collateral and the

cattle were income-producing assets. Furthermore, the Bank had the right to receive monthly payments of $718.32 pursuant to a dairy assignment, Mr. Carper was required to purchase credit life insurance in the principal amount of the lease and to also purchase insurance on the leased cattle. Although the Carpers ultimately filed bankruptcy and the Allen County Bank and the FDIC suffered a loss on the lease, at the time the lease was purchased it was a quality banking asset.

## JAMES AND JUNE CONN

■ James and June Conn were grain farmers who farmed approximately 800 acres of land near Royal Center, Indiana in Cass County. On June 3, 1983 the Leiters Ford State Bank loaned $147,262.00 to the Conns. The loan was payable upon demand and carried an interest rate of $1\frac{1}{4}\%$ below the Leiters Ford State Bank's base rate. On June 24, 1983 the Leiters Ford State Bank issued to the Allen County Bank a participation of $144,755.00 in the loan for $147,262.00 made to James and June Conn on June 3, 1983.

On July 19, 1983, the Leiters Ford State Bank loaned $33,530.19 to the Conns, at a rate of $1\frac{1}{2}\%$ below Leiters Ford State Bank's base rate, payable upon demand. On this same date, the Leiters Ford State Bank issued to the Allen County Bank a participation of $13,000.00 in the loan for $33,530.19 made to James and June Conn.

A prudent banker, in an arm's length transaction, would not have participated in the Conn loans. First, the Conns were highly leveraged. The Conns' financial statement as of January 31, 1983 showed that they had debts of $1,575,500.00 and a net worth of $705,750.00, for a debt-to-net worth ratio of 2.23 to 1. Furthermore, Don Imel, an FDIC bank examiner who examined the Allen County Bank, testified that the Conns had valued their farm land at $3125.00 per acre when real estate was selling in the $2,000.00 per acre range. Valuing the Conns' 480 acres of land at $2,000.00 per acre, rather than at $3125 per acre, decreases their net worth by $540,000.00 to $165,750.00. Thus, the Conns'

debt-to-net worth ratio was actually 9.51 to 1.

Next, the Conns had suffered a net loss in 1982 of approximately $60,000.00 and a loss from farm operations of approximately $80,000.00. Plaintiff's exhibit # 170, an application for Farmers Home Administration Services, filled out by the Conns on March 16, 1983, shows that for 1982 the Conns had total cash income of $249,084.00 and total cash expense of $310,794.00 resulting in a net loss for 1982 of $61,710.00. Included in the $249,084.00 figure for total cash income is $18,695 in non-farm income. Thus, the Conns had a net farm loss of $80,675.00 for 1982.

While on the witness stand Ed Stanley claimed that the Conns would have had a positive cash flow in 1982 if they had chosen to sell their 1981 crops in 1982 rather than store their 1981 crops. However, on their application for FHA services, the Conns stated that they had sold crops in 1982 for $203,536.00. Furthermore, as part of their FHA application the Conns listed their "Plan for 1983" in which they stated they planned to receive $213,905.00 from the sale of crops, presumably their 1982 crops. Clearly, the Conns sold crops in 1982 for $203,536.00 and even with this crop income the Conns still suffered an overall net loss of $61,710.00.

Further, the Conns did not have the resources to service their debt in 1983. On their FHA application, in the section entitled "Summary of Year's Business", the Conns listed their planned income and expenses for 1983. This plan showed a total cash farm income of $233,598.00, and cash farm operating expenses of $133,355.00, for a net cash farm income of $100,243.00. The Conns also planned to have $20,000.00 of non-farm income and $12,000.00 in cash family living expenses. As such, the Conns expected to have a net cash income of $103,243.00 for 1983. However, in 1983 the Conn's projected debt repayment totaled $198,352.00. Thus, by the Conns own projections for 1983 they did not have the ability to service their existing debt. In fact, the FHA, known as "the lender of last resort", denied the Conn's application for

their requested loan. Several witnesses for the defendants testified that the Conns could have met their debt obligations in 1983 if the FHA had approved their loan request and granted the Conns an extended repayment period. Nevertheless, the evidence clearly shows that as of March 31, 1983, the Conns were not in a position to take on any more debt and thus a reasonably prudent banker would not have participated in any further loans to the Conns.

The defendants submitted exhibits showing that the loans were secured by two security agreements, both dated June 3, 1983, giving the Allen County Bank a security interest in all growing or planted crops on the real estate farmed by the Conns. Further, the Allen County Bank had a security interest in a 1978 combine and a 1978 tractor, which defendants assert had a combined value of $45,000.00. Defendants claim that at the time the Allen County Bank participated in the Conn loans, the security interests in the Conn's crops and equipment had already been perfected by Leiters Ford State Bank for the benefit of itself and the participants.

However, in order to enable the Conns to obtain credit to purchase seed, fertilizer, etc. each year, the Allen County Bank subordinated its liens on each year's crops to the input lenders. Thus, on each year's crop sale, the input lenders were paid off first, leaving very little to secure the Allen County Bank's interest. The equity in the crops was gradually loaned up by the cost of keeping the Conns in business. When the Conns took bankruptcy, the only collateral securing the Allen County Bank's interest was the tractor and the combine. Ultimately, there is to be a $9,000 payout to the FDIC over ten years from the Conn bankruptcy.

### DEVRIES HOG AND GRAIN FARM, INC.

■ Sidney DeVries owned and operated DeVries Hog & Grain Farms, Inc. and also owned and operated DeVries Trucking, Inc. Sidney Devries resides in Rochester, Indiana and his farm was located in Fulton County, Indiana. DeVries Hog & Grain

Farm was incorporated on April 17, 1979 and was a major customer at Leiters Ford State Bank throughout the early 1980's. During this time the Leiters Ford State Bank sold many of DeVries' loans to the LaSalle National Bank in Chicago as participation loans. However, in 1983 LaSalle refused to buy any more participations in DeVries' loans. On February 24, 1983, Sidney DeVries applied for a Farmers Home Administration guaranteed loan in the amount of $500,000. The loan application was signed by Allen Chesser, Executive Vice President of the Leiters Ford State Bank who stated that he "does not believe the needed financing can be provided by the applicant from his or its own resources or obtained by him from other sources at rates and terms he or it could reasonably be expected to meet without an FmHA guarantee."

On March 24, 1983, the Allen County Bank purchased a $70,000 note from the Leiters Ford State Bank. A review of the Exhibits reveals that on March 29, 1980, Sidney DeVries granted to the Leiters Ford State Bank a security interest in all livestock, crops, and machinery and equipment owned and hereafter acquired by him. However, on April 4, 1980, February 6, 1981, March 12, 1981, March 13, 1981, March 17, 1981, March 27, 1981, April 8, 1981, April 16, 1981, May 27, 1981 and June 11, 1981, the LaSalle National Bank agreed to participate in loans to DeVries Hog & Grain Farm, Inc., which loans were made by the Leiters Ford State Bank. Each of the participation certificates were signed by officers of both banks and stated that the loan in which LaSalle was participating was adequately secured by the security agreement dated March 29, 1980. Clearly then, LaSalle had a prior interest in the collateral pledged in the March 19, 1980 security agreement rendering Leiters Ford State Banks' March 24, 1983 $70,000 loan to DeVries Hog & Grain Farm, Inc. unsecured for all practical purposes.

A March 9, 1982 security agreement signed by Sid DeVries pledged all livestock, all 1982 crops, and all farm equipment to the Leiters Ford State Bank as security for a $100,000 loan. Yet, on May 27, 1982, the LaSalle National Bank was given as security all the collateral listed on the March 9, 1982 security agreement. Thus, Allen County Bank's March 24, 1983 loan was again unsecured. On February 1, 1983, DeVries entered into a security agreement purporting to pledge all 1983 crops to the Leiters Ford State Bank. However, all crops had already been pledged to LaSalle National Bank in 1980 and 1981 as part of LaSalle's participation agreements with Leiters Ford State Bank. Thus, this security agreement did not provide adequate security for the Allen County Bank's loan.

Although the defendants claimed that Allen County Bank's $70,000 loan was secured by two separate indemnifying mortgages, dated March 29, 1980 and July 14, 1982, Exhibit ABX. Exhibit ABX consists of one indemnifying mortgage, dated March 29, 1980, wherein DeVries Hog & Grain Farm, Inc. mortgaged farm property to Leiters Ford State Bank in exchange for a $500,000 line of credit. However, this mortgage also secures twelve of LaSalle's 1980 and 1981 participation loans. Consequently, this mortgage did not sufficiently secure Allen County Bank's loan.

On April 11, 1983, the Allen County Bank purchased, in full, a $40,000 loan to DeVries Hog & Grain Farm, Inc. from the Leiters Ford State Bank. Defendants again claim that the loan was secured by the March 9, 1982 security agreement and two indemnifying mortgages dated March 29, 1980 and July 14, 1982. As noted above in conjunction with the $70,000 loan, all of the collateral secured by the March 9, 1980 security agreement and the March 29, 1980 mortgage was previously pledged to LaSalle National Bank.

Defendants also claim that this loan was secured by a security agreement dated March 1, 1983 which pledged as security Sidney DeVries' bean hedge account, a futures contract issued by Heinhold Commodities, Inc., a Chicago, Illinois brokerage firm. Exhibit ABS does indicate that the hedge account was pledged to the Leiters Ford State Bank as collateral. However there is no evidence in the record which would show that this hedge account, specu-

lative by nature, was ever of any value. Finally, Exhibit AAH shows that this loan was personally guaranteed by Sidney DeVries.

On June 14, 1983, the Allen County Bank participated in a $35,000 loan to Sidney DeVries from Leiters Ford State Bank. Of the original loan amount of $35,000, the Allen County Bank participated in $34,000 and the Leiters Ford State Bank retained $1,000. Defendants claim that this loan was secured by the two indemnifying mortgages dated March 29, 1980 and July 14, 1982, and by four security agreements whereby Sidney DeVries pledged all crops, machinery, equipment, and livestock, as well as his hedge account. However, as noted above, all of this collateral was already pledged to LaSalle National Bank and did not adequately secure the Allen County Bank's interest in the $34,000 participation loan.

By entering into the three DeVries transactions, the Allen County Bank extended credit in the amount of $144,000, or nearly 10% of the bank's sound capital, to Sidney DeVries and DeVries Hog & Grain Farm, Inc. In these three transactions, Leiters Ford State Bank risked only $1,000 of its own money, but risked $144,000 of the Allen County Bank's money. Yet Leiters Ford State Bank retained all rights to control the terms of the loans and, unlike its participations with LaSalle National Bank, Leiters Ford State Bank did not give the Allen County Bank's participations any warranties as to whether the security interest in the pledged collateral was valid and prior to other loans. Furthermore, the sale of these loans to the Allen County Bank

violated 12 U.S.C. § 371c(a)(3), which prohibits the sale of classified substandard loans to an affiliate [15].

Reviewing all the evidence, it becomes clear that at least as early as February 1983, Sidney DeVries and DeVries Hog & Grain Farm were facing severe financial difficulties. DeVries had failed to obtain a loan from the FmHA and LaSalle National Bank had refused to participate in any further loans to DeVries. Nevertheless, in March, April, and June of 1983, the Allen County Bank purchased three of DeVries' loans from the Leiters Ford State Bank. Not only were the borrowers in financial trouble, they were unable to give the Allen County Bank any new collateral for those loans and merely gave the Allen County Bank collateral to which the LaSalle National Bank had a prior secured interest. Consequently, the court finds that a reasonably prudent banker would not have purchased or participated in any of the three loans to DeVries or DeVries Hog & Grain Farm, Inc.

## LEONARD AND EILEEN DIAMOND

█ Leonard Diamond was a dairy and grain farmer in Steuben County, Indiana. On April 21, 1983, the Counting House Bank made a loan to Leonard Diamond and his wife, Eileen Diamond, in the amount of $248,791.69, at 16% interest, to be repaid over a period of 54 months. On April 25, 1983, the Allen County Bank participated in this loan in the amount of $41,465.28. The loan to the Diamonds was primarily a debt restructuring loan.

---

15. 12 U.S.C. § 371c(a)(3) provides:
   **(a) Restrictions on transactions with affiliates**
   \*   \*   \*   \*   \*   \*
   (3) A member bank and its subsidiaries may not purchase a low-quality asset from an affiliate unless the bank or such subsidiary, pursuant to an independent credit evaluation, committed itself to purchase such asset prior to the time such asset was acquired by the affiliate.
   12 U.S.C. § 371c(b)(10) provides:
   (10) the term "low-quality asset" means an asset that falls in any one or more of the following categories:

   (A) an asset classified as "substandard", "doubtful", or "loss" or treated as "other loans especially mentioned" in the most recent report of examination or inspection of an affiliate prepared by either a Federal or State supervisory agency;
   (B) an asset in a nonaccrual status;
   (C) an asset on which principal or interest payments are more than thirty days past due; or
   (D) an asset whose terms have been renegotiated or compromised due to the deteriorating financial condition of the obligor.

The loan agreement shows closing costs of $39,100, which is over 15% of the total loan amount, and there was a credit life premium of $7,868.65. The closing costs and the credit life premium were financed as part of the loan, were paid directly to the Counting House Bank, and were not shared with the participating banks. Also, a finder's fee of $11,483 was paid to Mr. George Barger, who received the appraisal of Diamond's real estate on behalf of Counting House Bank.

Prior to participating in this loan, Mr. Diamond and his farm and dairy operation were thoroughly investigated by the Allen County Bank. The Allen County Bank reviewed Mr. Diamond's milk production records, which reflected good production from his prior farm, and also determined that there was equity in Mr. Diamond's equipment and at least $138,000 equity in his farm land.

Furthermore, the Allen County Bank allegedly received substantial documentation on the Diamonds' financial condition prior to participating in this loan. Specifically, a letter was sent to the Allen County Bank from Counting House Bank setting forth the terms of the participation offer, including information on collateral. The letter contained the following documentation: a copy of the original note, a copy of the loan agreement, a copy of the farm security agreement, a copy of the Hastings Mutual Property Insurance, a copy of the indemnifying mortgage and Schedule A, a copy of the commitment for title insurance, a copy of the appraiser's statement and appraisal, a copy of the plat mat, a copy of the farmer's financial statement on Leonard and Eileen Diamond, copies of 1978, 1979, 1980, and 1981 tax returns, a copy of the credit bureau report on the Diamonds, a copy of the UCC–1 filings in Steuben County, and a copy of the UCC–1A filing in Steuben County on the Diamonds' fixtures. The letter provided further that copies of the final title insurance, recorded indemni-

fying mortgage, the recorded UCC–1s, and insurance would be forwarded to the Allen County Bank.

As for the collateral, the loan was secured by an irrevocable dairy assignment with County Line Cheese and that pursuant to this Agreement, the loan payments were to be made directly to the Bank by the dairy. Furthermore, the loan was also secured by all of the Diamonds' equipment, livestock, crops, accounts and contract rights. The Diamonds gave a loan guarantee to the Bank on January 1, 1984, and the loan was also secured by an indemnifying mortgage dated April 21, 1983, and recorded on May 2, 1983.

A review of the evidence pertaining to the Diamonds' financial history reveals the following. The Diamonds' federal income tax returns for the years 1978, 1979, 1980, and 1981 showed a net farm loss of $1420, $1496, $9758, and $52,030, respectively. The Diamonds' farmer's financial statement as of April 21, 1983 showed a net worth of $121,028.31 and total liabilities of $451,671.69, giving the Diamonds a debt-to-net worth ratio of 3.73 to 1. Using an independent appraisers value of the Diamonds' real estate, $302,000, rather than the Diamonds' self-reported amount, $350,-000, the Diamonds' debt-to net worth ratio equaled 6.18 to 1. After studying the Diamonds' tax returns and financial statement, and acknowledging that the Diamonds were seeking a large loan in order to restructure their current debt, Mr. Don Imel, an FDIC Bank Examiner, testified that he did not think an "individual under these circumstances could obtain credit anywhere."

Although the Diamonds did not appear to be in completely sound financial health, they did own and operate a large farm, which they had recently acquired, and had considerable assets which they put up as collateral for this loan [16]. The value of this

---

**16.** In Exhibit 1 to the Certificate of Participation the following was listed as security:

First security interest in all fixtures, Farm Machinery and equipment now owned inclusing [sic] but not limited to all tractors, tilling and

harvesting equipment or hereafter equipment purchased with this loan. All Dairy Cattle. A first security interest in all livestock, farm production, personal property including but not limited to all dairy cattle, beef cattle, swine &

collateral, as late as September 18, 1984, was as follows. A junior lien on 175 acres of land with equity of about $151,000, 29 head of milk cows valued at $29,000, machinery and equipment valued at $73,000, and 1984 crops valued at $106,000. A January 14, 1984 FDIC Examination Report of the Allen County Bank stated that the collateral was "valued at $310M by bank management during the examination." A September 18, 1984 FDIC Examination Report of the Counting House Bank noted that collateral appeared to be "ample". The FDIC Examination Reports also state that Mr. Diamond had suffered severe cash flow problems in 1983 due to a drought which reduced his crop yields and forced him to buy feed for the dairy herd. Mr. Diamond incurred further problems due to the fact that he received diseased cows under a leasing program[17]. The diseased cows cost Mr. Diamond approximately $1 per 100 pounds of milk produced. Additionally, three lawsuits had been filed against Mr. Diamond.

From April 21, 1983 to January 17, 1984 Mr. Diamond reduced his Allen County Bank loan balance from $41,465.28 to $37,791.47. However, Mr. Diamond filed Chapter 11 bankruptcy in February of 1984 which was converted to a Chapter 7 bankruptcy in August of 1985, after Mr. Diamond abandoned his farm and moved out of the area. On October 17, 1986 the Counting House Bank acquired the Dia-

monds' 175 acre dairy farm via a Sheriff's Deed. An independent appraisal of the property on October 15, 1986 valued the property at $184,000. This appraised value less the allotted five percent sales commission left $175,000 of available collateral. Since the Counting House Bank acquired the property at a Sheriff's sale, the Bank obtained a priority lien on the entire 175 acres of land despite the pro rata participations. The total balance outstanding on the Diamond loan to Counting House Bank was $173,000, which left the participating banks without any collateral. In September of 1988, the FDIC sold the Allen County Bank's portion of the Diamond loan in a bulk sale. The pro rata sale price of the Diamond loan was $1,418.76.

After reviewing all the evidence presented to the court, the court finds that the defendants were not negligent in purchasing a participation in the Diamond loan. The defendants had investigated Diamond's financial history prior to entering into the participation agreement. Although participating in the Diamond loan entailed a degree of risk due to Diamond's recent losses, the court finds that the defendants' act of exposing the Bank to this degree of risk on a relatively small participation loan did not constitute negligence. Although Mr. Diamond filed bankruptcy and the Allen County Bank and the FDIC suffered a loss, in this instance it is clear that many of Mr. Diamonds' cash flow problems were the

sheep, including but not limited to all offspring. A first security interest in all crops and more particularly 1983 growing crops and in all inventory, Accounts Receivable, Contract Rights, instruments, chattel paper and general intangibles, now existant [sic] or hereafter acquired and the proceeds therefrom. All property similar to that listed above, which at any time may hereafter be acquired by the Debtor(s) including, but not limited to, all off-spring of livestock, additions and replacements of livestock and poultry, and replacements of and additions to equipment and other personal property above described; and all products of crops, livestock and poultry, and all feed to be used in fattening or maintaining said livestock and poultry. All proceeds of the sale or other disposition of any of the property described or referred to under Items 3 to 7, inclusive above, and of any offspring, wool, milk, poultry products and contract rights derived from said property, together with all accounts receivable resulting from such

sales. It also applies to debtors' interest in crops described above planted or growing on the hereinafter described farm(s) more than 1 year from date hereof and on which crops a separate unfiled security agreement is subsequently taken. All of the above described crops and fixtures are or will become located on the farm land owned by Leonard Diamond and rented by Leonard Diamond located on the Scott Twp 27N R 14 E. Indemnifying Mortgage on 175 acres of Scott Twp 137N R 14 E. Irrevokable [sic] Milk Assignment to County Line Cheese, Albion, Indiana. It is agreed that the Borrowers will contract no additional debt or dairy assignment for the First three (3) years without the written permission of the bank.

17. Mr. Diamond owned 47 cows, but milked 91 cows. The balance were leased at $30 each per month.

result of a drought that diminished his crop yield and the receipt of diseased milk cows, neither of which could have been foreseen by the defendants in April of 1983 when the loan was participated in. Likewise, the defendants could not have foreseen that Mr. Diamond, after suffering marital problems as well as financial problems, would misappropriate much of the collateral [18] and then abandon his farm, leaving it in the Bank's hands. Thus, the court finds that at the time the Diamond loan was participated in it was a quality banking asset.

## M & M DESIGNERS, INC.

■ Charles H. Merry and Gerry Merry, husband and wife, were the president and vice-president, respectively, of M & M Designers, Inc. On March 11, 1982 the Leiters Ford State Bank made a loan to M & M Designers, Inc. in the amount of $265,-000.00. The loan was guaranteed by Ray Maggard, Nancy Maggard (Ray's wife), Charles H. Merry and Gerry Merry. The purpose of the loan was identified as "building expenses". M & M Designers, Inc. sought to construct and operate a "steakhouse" type restaurant in Rochester, Indiana.

The contemplated restaurant was quickly constructed, and on or about May 24, 1982, Mr. and Mrs. Merry of Merry Enterprises, Inc. began operating the Country Rib and Steak Barn. The Merrys were unable to meet all of their financial obligations and on June 9, 1982 the loan to M & M Designers was rewritten for an increased amount of $319,770.00. Nevertheless, the Merrys were still unable to recover a profit on the restaurant and as of August 31, 1982 the restaurant had lost $21,786.00. On September 3, 1982 the Allen County Bank participated in the June 9, 1982 loan. The Allen County Bank's total participation was $125,000.00.

Although the restaurant building was a completely new structure, the Merrys soon began noticing that the building had been defectively constructed. As a result, Mr. Merry became involved in litigation with the contractor, Maggard Construction Company, and refused to pay to Leiters Ford State Bank any further payments on the loan. Consequently, in early 1983 Leiters Ford State Bank began trying to find a buyer for the Merrys' restaurant.

On April 1, 1983 Edwin E. Lucas and Janice A. Cooper entered into an agreement with the Leiters Ford State Bank, M & M Designers, Inc., and Charles and Gerry Merry. This agreement provided that Lucas and Cooper would purchase the restaurant from M & M Designers, Inc. on a land contract for $400,000.00 [19]. Lucas and Cooper were to pay M & M Designers, Inc. $10,000.00 on or before the date of closing and the principal balance of $390,000.00 was to be paid in monthly installments. Lucas and Cooper did not take out a loan to pay Mr. Merry for the property. And Lucas and Cooper did not assume Mr. Merry's original loan with Leiters Ford State Bank. Lucas and Cooper merely entered into a contract to purchase the property over a 20 year term. Mr. Merry then refinanced his M & M Designers loan with Leiters Ford State Bank for the larger amount. The record shows that on April 1, 1983, the original loan to M & M Designers, Inc. was rewritten for an increased amount of $383,-528.60. On April 18, 1983 the Allen County Bank participated in this loan. The Allen County Bank's total participation was for $130,082.00.

Although the land contract provided that Lucas and Cooper were to make monthly payments of $3763.58 for two years, then increased payments thereafter, Lucas and Cooper made only sporadic payments for a short period of time before they both de-

---

18. Although it is somewhat unclear as to what happened to Diamond's livestock, machinery and equipment which he had pledged as collateral for this loan, the FDIC Examination Reports suggest that Mr. Diamond sold the farm machinery and at least some of the milk cows, including cows which he did not own. Apparently, the Counting House Bank had initiated suit against several of the sale barns that sold the cows, but it was unknown how much money would be recovered.

19. This land contract was entered into on April 1, 1983 and recorded with the Fulton County Recorder on July 1, 1983.

clared bankruptcy. Lucas and Cooper essentially abandoned the restaurant which remained empty for over a year. On July 10, 1987 the Leiters Ford State Bank sold the restaurant to Margaret Covington Doran for $340,000.00. Since the restaurant had been closed for some time, Doran found it necessary to remodel the restaurant before it could be re-opened. To assist Doran in her efforts to make the restaurant a success, Ed Stanley agreed that Doran would not be required to make any payments on the restaurant loan until she had the restaurant fixed up and started making a profit. Nevertheless, even after remodeling the restaurant, Doran suffered losses of approximately $1,000.00 a month. In 1987 the Leiters Ford State Bank and the Counting House Bank merged to form Liberty Bank and Trust. Liberty Bank and Trust closed in October of 1988. The FDIC, as receiver of Liberty Bank and Trust, became the owner of the restaurant.

A review of the evidence indicates that the Leiters Ford State Bank undertook a fairly extensive investigation of Mr. Merry and his proposed business venture prior to making this loan. Mr. Merry's letters of recommendation indicate that he was a well respected business man who met his credit obligations in an exceptional manner, Merry's resume shows that he has spent most of his life in the food industry and repeatedly found success in managing restaurants and other small businesses. Merry's financial statement, dated July 13, 1981, showed that he had a net worth of $259,-100.00. Projected monthly sales for the proposed restaurant were $40,000.00 with an expected net profit of $12,320.00 [20]. In light of this evidence, the court finds that the Leiters Ford State Bank adequately investigated the borrower and thus the defendants did not, as plaintiff claims, participate in a loan that had not been investigated.

The original loan agreement, dated March 11, 1982, indicates that the loan was secured by a Security Agreement dated March 11, 1982 listing four indemnifying

mortgages dated March 11, 1982 as security for the loan. On June 9, 1982, in conjunction with the re-writing of M & M Designers original loan, Leiters Ford State Bank likewise received four indemnifying mortgages on the Merrys' four parcels of real estate. Title searches and loan opinions indicate that Leiters Ford State Bank received a first or second mortgage on the subject properties.

Although Leiters Ford State Bank requested that Mr. Merry obtain $135,000.00 worth of credit life insurance, Mr. Merry was able to obtain only $100,000.00 worth of insurance. However, the Merrys did obtain home owners insurance on the residences on which Leiters Ford State Bank was named as mortgagee. Furthermore, on June 9, 1982 Charles Merry and Gerry Merry each executed a loan guaranty agreement in which they personally guaranteed the Leiters Ford State Bank loan to the extent of $319,770.00. The evidence also shows that the Leiters Ford State Bank acquired a security interest in all restaurant equipment now owned and hereafter acquired by M & M Designers, Inc. On September 7, 1982 the Leiters Ford State Bank filed UCCs with the Secretary of State and the Recorder of Fulton County. Accordingly, the court finds that the loan, both as originally written and as subsequently re-written, was adequately secured.

After reviewing all of the evidence, the court finds that as of September 3, 1982, the date the Allen County Bank participated in M & M Designers' original loan, the loan was a quality banking asset and the defendants did not breach any duty by allowing the Allen County Bank to enter into the participation agreement with the Leiters Ford State Bank. The record clearly shows that Mr. Merry was an astute businessman and that he had a substantial net worth. The court accepts as true Mr. Ed Stanley's testimony that the banks requested and received a feasibility study which showed that the contemplated restaurant would be successful. The loan was

---

**20.** The projected sales report, Defendants' Exhibit MME, does not indicate how the figures in the report were arrived at, or who prepared the report.

secured by indemnifying mortgages, credit life insurance, and security agreements. Although the restaurant was not making a profit on the date the Allen County Bank entered into the September 2, 1982 participation agreement, the evidence is clear that early losses are common for a new business, particularly in a case such as this where there exists high rent expense resulting from construction costs. The FDIC has not shown by a preponderance of the evidence that the defendants breached their duties as directors of the Allen County Bank by entering into the September 2, 1982 participation agreement.

With respect to the Allen County Bank's April 1, 1983 participation in M & M Designers' re-written loan, the court finds that the defendants did not breach their duties as directors. Although the restaurant had encountered financial difficulties in late 1982 and early 1983, these difficulties appear to have been brought on primarily by the poor construction of the restaurant and Mr. Merrys refusal to continue making payments. While the FDIC contends that the sale of the restaurant to Lucas and Cooper was improper, the FDIC has not proven this contention. There is no evidence in the record which would show that the Allen County Bank would have been in a better position if Leiters Ford State Bank had foreclosed on the restaurant. The mere fact that Lucas and Cooper did not assume M & M Designers' original loan and that this loan was refinanced does not establish that the defendants acted improperly when they allowed the Allen County Bank to participate in the refinanced loan. Consequently, the defendants are not liable for the losses suffered as a result of Allen County Bank's participations in the loans to M & M Designers, Inc.

### PINKERTON FARMS, INC.

■ James and Mona Pinkerton operated Pinkerton Farms, Inc., a hog farm located in Warren, Indiana. The Pinkerton's also owned and operated Pinkerton Farm Commodities, Inc., a wholly-owned subsidiary of Pinkerton Farms, Inc. On April 27, 1983, the Leiters Ford State Bank loaned Pinkerton Farms $361,000.00. On May 26, 1983, the Allen County Bank participated in the Pinkerton loan to the extent of $120,179.52. The note was due on demand, or when all present and future inventories were liquidated, with accrued interest due and payable semi-annually beginning on October 27, 1983. The participation certificate issued to Allen County Bank lists the security as all swine, all 1982 corn, and all crops for 1983.

However, the total value of the collateral taken to secure this loan was $912,422.70. The value of the hogs pledged on this note on April 27, 1983 was $405,650.00. The note was also secured by all 1982 soybeans which had a value of $105,000.00. As additional security for the loan, the bank also took an interest in the Pinkerton's 1983 crops which included corn, wheat and soybeans valued at $411,772.70. The lead bank obtained personal guarantees from James and Mona Pinkerton. On April 27, 1983, James and Mona Pinkerton had a net worth of $1,249,000.00. Pinkerton Farm's financial statement, dated November, 1982 showed equity in the amount of $1,173,000.00.

The Pinkerton's projected cash flow for 1983 for the commodities business was $65,727.00 and for the farming operation was $203,220.00. For every year from 1983 through 1988, current UCCs were filed on all crops and all hogs owned by the Pinkerton entities with both the Secretary of State's Office and the Huntington County Recorder. Allen County Bank's position on this loan was further protected because Leiters Ford State Bank, for its benefit and the participants' benefit, required insurance on the hogs and stored grain with Leiters Ford State Bank being designated as the loss payee. Leiters Ford State Bank for its benefit and the benefit of its participants, including Allen County Bank, required James Pinkerton to carry insurance on his life with Leiters Ford State Bank being the beneficiary.

Allen County Bank's interest was protected because the Pinkertons were required in 1983, 1984, and 1985, to provide

the Bank with the identity of livestock dealers to whom they could have sold their hogs as well as grain elevators at which they could have sold their crops. Once this information was obtained from the Pinkertons, the potential purchasers were put on notice of Leiters Ford State Bank's lien. The bank also required the Pinkertons to provide it with reports so it could monitor the hog inventory. The Allen County Bank's interest was also protected by Pinkerton Farm's large ownership interest in real estate. In August of 1982 this real estate had a substantiated equity figure of $1.6 million.

The character of James Pinkerton was well-known by the Allen County Board of Directors at the time they participated in this loan. Mr. Ed Stanley had known James Pinkerton for thirty-five years, and James Pinkerton's wife, Mona, is Ed Stanley's cousin. James Pinkerton was known as a high-quality farmer who had a very well established farm. It is undisputed that Pinkerton Farms was extremely well organized and managed.

Pinkerton has never paid any principal on the loan. However, Leiters Ford State Bank never demanded payment on the note nor did its successor, Liberty Bank and Trust. As a participant, the Allen County Bank, and subsequently the FDIC, did not have standing to make a demand on the debtor. Pinkerton defaulted on interest payments in April 1986 and again in October 1987. Pinkerton has paid interest through 1988. In 1988, Pinkerton Farms refinanced its debts through a loan from Summit Bank. Also, in April, 1988, Pinkerton and Liberty Bank signed a commitment letter to refinance Pinkerton Farm's debts. This was a ten-year payout plan that provided for an annual principal reduction of the Allen County Bank participation loan.

This agreement was supported by collateral including a mortgage dated April 15, 1988 on Pinkerton Farm Commodity, Inc.'s property. As further security for the agreement, on April 15, 1988, a first mortgage was taken on 2.79 acres of Pinkerton Farm, Inc., which acreage is highly improved with an elaborate hog barn opera-

tion. In April, 1988, Liberty Bank and Trust Company also took a security interest in numerous vehicles owned by Pinkerton Farm Commodities, Inc., Pinkerton Farm, Inc., James and Mona Pinkerton, and Dan Pinkerton. Liberty Bank also took a security interest in all farm machinery owned by the Pinkerton entities. Liberty Bank took a first interest in rolling stock semi-tractor trailers. After the FDIC was appointed receiver of the bank, it filed UCCs to perfect the collateral taken by Liberty Bank pursuant to the 1988 agreement.

After reviewing all of the evidence, the court concludes that as of May 26, 1983, the date the Allen County Bank participated in the Pinkerton Farm, Inc. loan, the loan was a quality banking asset and the defendants did not breach any duty by allowing the Allen County Bank to enter into the participation agreement with the Leiters Ford State Bank. The record clearly shows that the Pinkertons were outstanding farmers as well as astute business people who had a substantial net worth. The loan was adequately secured by hogs, crops, and the personal guarantees of the farm's operators. The collateral was inventoried and potential purchasers of the collateral were put on notice of Leiters Ford State Bank's lien. The FDIC has not shown by a preponderance of the evidence that the defendants breached their duties as directors of the Allen County Bank by entering into the May 26, 1983 participation agreement.

### POWELL IMPLEMENTS, INC.

■ In 1982, the Leiters Ford State Bank loaned Richard Powell $120,000.00 to set up an implement business in Kewanna, Indiana. For the ten months ending January 31, 1983, Powell Implement, Inc. showed an operating loss of $36,440.00. In April 1983 the Powell loan was increased to $281,974.88, which was to be repaid at $4,000.00 a month at 12 percent interest. Allen County Bank participated in this loan in the amount of $90,000.00. In April 1984, the Powell loan was rewritten for $277,-763.55, of which Allen County Bank re-

ceived a participation of $89,113.29. Pow-ell's monthly payment was increased from $4,000 per month to $5,573.96 per month.

When the Leiters Ford State Bank made this loan, the collateral securing the loan included the property of Powell Implement, Inc. valued at $167,282.00. This security included: a first mortgage on the Powell Implement, Inc. building and land and two nearby lots which had an appraised value of $58,500.00; a first lien on the Powell Implement, Inc. truck and trailer which had a value of $16,000.00; machinery, equip-ment and tools valued at $20,182.00; a first lien on the parts inventory purchased by Powell Implement, Inc. valued at $72,000. The bank also took a first lien on Powell Implement, Inc.'s accounts receivable which had potential future value.

Richard Powell and his wife, Tammy, both signed personal guaranties. The Pow-ells pledged as collateral for this loan equi-ty in their farm land which at the time the loan was participated in by the Allen Coun-ty Bank had a value in the range of $250,-011.00 to $300,000.00. The Powells also pledged their personal farm equipment which had no liens and had a value of $133,000.00.

Leiters Ford State Bank, for the benefit of itself and all participants, went to great lengths to perfect the bank's security inter-ests in all items of collateral. The Bank filed UCCs on virtually everything owned by the Powells individually and by Powell Implement, Inc. The Bank also investigat-ed its collateral position in the Powell real estate by obtaining title opinions based on title searches performed by Attorney Alan Burke.

Based on the evidence submitted to the court, the court concludes that there was no breach of duty by the defendants with regard to the initial decision to participate in this loan in April 1983 or with regard to the decision to participate in the loan as rewritten in April 1984. There was exten-sive investigation and documentation of this loan prior to the participation. The Leiters Ford State Bank required Powell Implement, Inc. to submit business plans and sale projections. Mr. Powell provided

the Bank with a prospectus and a survey of the potential market share which he ob-tained from International Harvester. The market share survey was favorable. Fur-ther investigation revealed that there was an established market for an implement business in Kewanna, Indiana as illustrated by the success of the prior implement deal-er in Kewanna. The defendants had per-sonal knowledge of the success of the prior owner, Mr. Sydell, as he had been a long time customer of Leiters Ford State Bank. There was no indication that the implement market was about to change.

Many events unforeseen to Mr. Powell and the lending banks occurred between 1982 and 1986 which caused Powell's imple-ment business to default on its loan. The 1983 drought adversely affected implement sales and the drought was not foreseeable to Powell when he entered into the imple-ment business. In 1984 International Har-vester filed for bankruptcy which harmed Powell Implement, Inc.'s business by ad-versely affecting customer confidence. Mr. Powell did not foresee the 1984 bank-ruptcy of International Harvester when he opened the business. In the years between 1982 and 1986, farm real estate values dropped and farm sales resulting from foreclosures were frequent. These factors, combined with high interest rates, greatly depressed the farm implement market. Consequently, the court finds that the de-fendants are not liable for the losses suf-fered as a result of Allen County Bank's participations in the loans to Powell Imple-ment, Inc.

### CONCLUSIONS OF LAW

This court has jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345, and 12 U.S.C. § 1819. Jurisdiction over the par-ties is conceded by counsel.

The FDIC's complaint against the defen-dants as directors and/or officers of the Allen County Bank is in four counts: (1) breach of fiduciary duties of loyalty, good faith, and avoidance of self-dealing, in the management, supervision, and direction of the Bank; (2) breach of common law and statutory duties including the duties of

good faith and the exercise of reasonable skill, due care, and diligence in the management, supervision, and direction of the Bank; (3) violation of bank lending limits, I.C. 28–1–13–1; and (4) breach of contract (oath of office) to render services as directors and/or officers honestly, diligently, and faithfully, and to not knowingly or willingly permit any of the banking laws of the State of Indiana to be violated.

■ As a preliminary matter, the FDIC has raised the issue as to whether the court should consider evidence "purporting to diminish the FDIC's right of recovery by virtue of decisions made by it in connection with the collection of the assets" of the Allen County Bank. *FDIC v. Greenwood*, 719 F.Supp. 749, 751 (C.D.Ill.1989).

Since acquiring the Allen County Bank assets, FDIC has sold the Abbott Coal and Leonard Diamond loans. FDIC's claim on the Carper loan was settled during Carper's bankruptcy proceeding. The remaining loans (Conn, DeVries, M & M Designers, Pinkerton, and Powell) are still held by the FDIC. Defendants contend that the FDIC has negligently failed to maximize its recovery on these loans, and that therefore the defendants' actions have not proximately caused any losses to the FDIC.

In *FDIC v. Greenwood, supra*, the defendants wished to introduce evidence at trial that there were sources of repayment for loans which the FDIC sold as part of a bulk sale. The Court, relying on *FSLIC v. Roy*, 1988 WESTLAW 96570 (D.Md.1988), and *FDIC v. Carlson*, 698 F.Supp. 178 (D.Minn.1988), granted FDIC's motion in limine to exclude the evidence, holding that:

Public policy concerns mandate a finding that the duty of FDIC to collect on assets of a failed institution runs to the public and not to the former officers and directors of the failed institution. Thus, the decision of the FDIC that it would be more cost effective to sell certain loans as part of a bulk sale rather than incur the considerable expense involved in collecting certain assets cannot be the basis of reduction of FDIC's claims.

719 F.Supp. at 750.

The "public policy concerns" mentioned in *Greenwood* and *Roy* are discussed at greater length in *FSLIC v. Burdette*, 718 F.Supp. 649 (E.D.Tenn.1989). The Court first noted that "the FSLIC or the FDIC, when attempting to collect the assets of a failed or failing banking institution, are to be treated differently than a typical plaintiff in a civil case." 718 F.Supp. at 662. After discussing the opinions in *Roy, Carlson*, and *Greenwood*, the Court explained the public policy reasons for barring directors and officers from second-guessing the FSLIC's collection efforts:

Suits by the FSLIC as a receiver to recover assets, or to recover damages for wrongdoing, should not be encumbered by an examination in court of the correctness of any specific act of the FSLIC in its receivership. The rule that there is no duty owed to the institution or wrongdoers by the FSLIC/Receiver is simply a means of expressing the broad public policy that the banking laws creating the FSLIC and prescribing its duties are directed to the public good, and that every separate act of the FSLIC as a receiver in collecting assets is not open to second guessing in actions to recover damages from wrongdoing directors and officers. If there is no wrongdoing by the officer or director, there can be no liability, but if wrongdoing is established, the officer or director should not be allowed to set up as a defense a claim that would permit the detailed examination of the FSLIC's action as a receiver.

When an individual becomes an officer or director of a savings and loan, they are aware that if that institution becomes insolvent, federal banking laws and regulations require that a receiver be appointed, often the FSLIC, to marshal the institution's assets as promptly as possible to avoid further injury to the insurance fund and the public at large. The special urgency required in the liquidation of a savings and loan, and a commercial bank, is a result of the special nature of the insurance fund and the procedure for

collection and disbursements of assets as provided by Congress. This is a fact any officer or director of that institution should be aware of. Consequently, a director or officer of a failed savings and loan accused of wrongdoing should not be entitled, and should not be surprised by an inability, to examine the conduct of a receiver of a failed institution in an attempt to reduce the recovery of the receiver in subsequent civil actions by the receiver.

As a result, the court believes that the cases cited above are soundly decided and applicable to the instant case. The affirmative defenses at issue should be struck, as these defenses would require the public to bear the possible errors of judgment by the FSLIC as receiver rather than the persons found to be guilty of wrongdoing, and removing these defenses will help the court and the jury focus on the real issues presented in the pleadings. To hold otherwise would invite a flood of evidence as to every FSLIC discretionary decision concerning the collection of Knox assets, and could easily distract the jury from making the primary determination of liability or the lack thereof of the defendant officers and directors.

718 F.Supp. at 663–64. *See also FDIC v. Coble,* 720 F.Supp. 748 (E.D.Mo.1989).

In *Vogel v. Grissom,* Civ.Act. No. Ca3–89–0467–D (N.D.Tex., 9/7/89), the Court held that under the Federal Tort Claims Act, the FDIC exercises its "discretionary function" when it disposes of the assets of an insolvent bank, and it therefore cannot be held liable for such activities. The Court concluded that any attempt by it "to impose its economic knowledge on the FDIC is precisely the kind of 'judicial second-guessing' against which the discretionary function exception was designed to protect." *Id.* at 10.

Similarly, in *FDIC v. Oakes,* Civ.Act. No. 89–2261–S, 1989 WL 151954 (N.D.Kan. 1989), the Court stated:

In their responses to FDIC's motion, defendants appear to concede that under established case law, FDIC owes no duty to bank directors and officers for pre-bank closing activities. Without a duty of care, there can be no finding of negligence. Thus, no affirmative defenses or counterclaims based upon FDIC's activities may be asserted against FDIC by bank directors or officers under theories of comparative/contributory negligence or breach of fiduciary duty (hereafter referred to as the "no duty rule"). *First State Bank of Hudson County v. United States,* 599 F.2d 558, 561–66 (3d Cir. 1979), *cert. denied,* 444 U.S. 1013, [100 S.Ct. 662, 62 L.Ed.2d 642] (1980); *Harmsen v. Smith,* 586 F.2d 156, 158 (9th Cir.1978); *FSLIC v. Burdette,* 696 F.Supp. 1183, 1189 (D.Tenn.1988); *FDIC v. Butcher,* 660 F.Supp. 1274, 1282 (D.Tenn.1987); *Niver,* 685 F.Supp. [766] at 768 [(D.Kan.1987)]; *FDIC v. Williams,* 599 F.Supp. 1184, 1204–06 (D.Md.1984).

Defendants' responses do, however, attempt to distinguish the present case from the "no duty rule." Defendant McCartney first argues that even if FDIC owes no duty for its pre-bank closing activities, FDIC may be liable for its post-bank closing activities, as in the present case. Upon examination of this contention, the court finds no logical basis for distinguishing between pre- and post-bank closing activities of the FDIC. *See FDIC v. Carlson,* 698 F.Supp. 178, 179 (D.Minn.1988) (citing *FSLIC v. Roy,* No. JFM 87–1227 (D.Md. June 28, 1988)). At both time periods, the FDIC's duty is owed, not to bank directors, officers or even shareholders, but to the insurance fund it is charged with protecting and to the banking public. *See First State Bank of Hudson County,* 599 F.2d at 563; *First Nat'l Bank of Scotia v. United States,* 530 F.Supp. 162, 166 (D.D.C.1982).

In *FDIC v. Carter,* 701 F.Supp. 730 (C.D.Cal.1987), the court reached a contrary result by distinguishing between the discretionary functions and the ministerial functions of the FDIC:

The discretionary function cases distinguish between decisions grounded in social, economic, and political policy, and

those which involve routine ministerial tasks of government. Thus, the government cannot be sued for failing to build a lighthouse at a specific location, but it can be sued for operating a lighthouse negligently, once it is built. *Indian Towing [v. U.S.]*, 350 U.S. [61] at 69, 76 S.Ct. [122] at 126 [100 L.Ed. 48 (1955)]. In the banking context, the FDIC cannot be held liable for failing to warn bank officers and directors about misfeasance it discovers during a routine inspection. Further, the decision to impose a conservatorship or receivership on a troubled bank is within the discretion of the bank regulators. (Footnote and citations omitted).

However, the emerging consensus is that most of the FDIC's actions when disposing of the assets of a bank *are* purely ministerial, and are not grounded in social or economic policy. As a result, these actions can serve as the basis for a counterclaim or affirmative defense....

When the FDIC acts in a purely proprietary capacity, for instance when it collects routine debts and manages routine assets, it can assume a duty to a bank. As defendants correctly argue, it would be extremely inequitable if the FDIC could negligently fail to collect on a loan, and then sue the directors and officers of the bank for the loss on the loan. The Court therefore holds that with respect to such proprietary functions, the FDIC is liable to the directors and officers of a bank for its own negligence. This negligence can be the basis of either an affirmative defense or a compulsory counterclaim for recoupment.

In general, the dividing line for the FDIC's negligence liability is the date it assumes receivership of a bank. Before that time, the discretionary function exemption of the FTCA protects the FDIC from any liability for negligence in examining a bank, *Hudson County*, 599 F.2d at 564, or for negligence in the decision to impose or accept a receivership, *[Federal Deposit Ins. Corp. v.] Jennings*, 615 F.Supp. [465] at 468 [(W.D.Okl.1985)]. These are policy decisions which a court

cannot second-guess. After the FDIC makes the decision to become the receiver, it can be held liable for negligently performing proprietary tasks.

701 F.Supp. at 735–37.

The *Carter* decision has recently been criticized in *FDIC v. Baker*, 739 F.Supp. 1401 (C.D.Cal.1990). In *Baker*, the Court discussed the impact of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA) on the reasoning in *Carter:*

It is *Carter* which supports all defendants' opposition to the plaintiffs' motion to strike. Carter was premised on what was perceived as an "emerging consensus" that most of the FDIC's actions when disposing of the assets of a bank are purely ministerial and are not grounded in social or economic policy. *Id.* at 736. The remaining cases relied upon by defendants turn on the "proprietary" distinction as well. The FDIC challenges the validity of *Carter's* rationale on two fronts: first, that this premise, if ever valid, is no longer valid in light of the passage of FIRREA. Second, the current emerging trend among courts is to adopt the "no-duty" rule and eliminate the regulatory/operational distinction.

The FDIC highlights certain portions of FIRREA which emphasize substantial public policy directives for the RTC's [Resolution Trust Corporation's] disposition of the property of failed institutions. These concern maximizing of the net present value of return and avoidance of economic impact for those real estate markets that are distressed. Sections 21A(b)(3)(C)(i), (ii); 21A(b)(12)(D). The FDIC reasons, in turn, that these statutory directives signify that the FDIC is executing public policy determinations made by Congress. Thus, it acts with agency discretion and cannot be described as it responds to its duty in disposing of assets as either ministerial or purely proprietary.

The massive overhaul effected by FIRREA is, if anything, understated by the FDIC. As the introduction to an article in the American Bar Association's publi-

cation, *The Business Lawyer*, states, "[T]he [Act] represents a sweeping legislative effort to resolve the financial crisis confronting the thrift industry." [Fn. omitted.] Clark, Murtagh, and Corcoran, *Regulation of Savings Association Under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989*, 45 Bus.Law. 1013 (1990). The FDIC rightly relies on FIRREA as good reason to characterize the RTC's and FDIC's duties in disposing of failed institutions' assets as carrying no duty to any but the public.

739 F.Supp. at 1406.

Furthermore, on March 26, 1991 the United States Supreme Court decided *United States v. Gaubert*, — U.S. ——, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). In *Gaubert* the Supreme Court held that the involvement of the Federal Home Loan Bank Board in the day-to-day management of a financial institution was protected by the discretionary function exception to the Federal Tort Claims Act. In so holding, the Court rejected the Fifth Circuit's position that there is a dichotomy between discretionary functions and operational activities:

> In light of our cases and their interpretation of § 2680(a), it is clear that the Court of Appeals erred in holding that the exception does not reach decisions made at the operational or management level of the bank involved in this case. A discretionary act is one that involves choice or judgment; there is nothing in that description that refers exclusively to policymaking or planning functions. Day-to-day management of banking affairs, like the management of other businesses, regularly require judgment as to which of a range of permissible courses is the wisest. Discretionary conduct is not confined to the policy or planning level.

111 S.Ct. at 1275.

The Supreme Court further stated:

> Neither is the decision below supported by *Indian Towing*. There the Coast Guard had negligently failed to maintain a lighthouse by allowing the light to go out. The United States was held liable, not because the negligence occurred at the operational level but because making sure the light was operational "did not involve any permissible exercise of policy judgment." *Berkovitz [by Berkovitz v. U.S.], supra*, [486 U.S. 531], at 538, n. 3, 108 S.Ct. [1954], at 1959, n. 3 [100 L.Ed.2d 531 (1988)]. Indeed the government did not even claim the benefit of the exception but unsuccessfully urged that maintaining the light was a governmental function for which it could not be liable. The Court of Appeals misinterpreted *Berkovitz's* reference to *Indian Towing* as perpetuating a nonexistent dichotomy between discretionary functions and operational activities. [*Gaubert v. U.S.*,] 885 F.2d [1284], at 1289 [(5th Cir. 1989)]. Consequently, once the court determined that some of the actions challenged by Gaubert occurred at an operational level, it concluded, incorrectly, that those actions must necessarily have been outside the scope of the discretionary function exception.

*Id.* 111 S.Ct. at 1275–76.

██ Thus, the holding in *Gaubert* overrules *FDIC v. Carter* insofar as *Carter* holds that the FDIC's actions when disposing of a bank's assets can serve as a basis for reducing the amount of the FDIC's recovery because such actions by the FDIC are ministerial or operational. Clearly, the FDIC's actions when acting as receiver of a failed bank are protected by the discretionary function exception to the Federal Tort Claims Act. Consequently, in determining the amount of the FDIC's recovery, the court will disregard evidence that was introduced in an effort to diminish the FDIC's right of recovery as a result of decisions it made in connection with the collection of the Allen County Bank's assets.

██ Defendants are personally liable for the damages that were caused to Allen County Bank as a result of their breaches of duty. A proximate cause of an injury is the cause which sets in motion the chain of circumstances leading up to the injury. *New York Central R. Co. v. Ca-*

*vinder*, 141 Ind.App. 42, 211 N.E.2d 502 (1965). It involves the idea of continuity in that there must be some degree of progression from the negligent act into the casual sequence which results in injury. *Tabor v. Continental Baking Company*, 110 Ind. App. 633, 38 N.E.2d 257 (1941). Proximate cause has been defined as that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of and without which the result would not have occurred. *Johnson v. Bender*, 174 Ind.App. 638, 369 N.E.2d 936 (1977). Foreseeability of injury is regarded as an essential element or fundamental test of proximate cause. Thus, negligence will not be deemed to have been the proximate cause of injury so as to impose liability therefor, unless the consequence was one which, in the light of attending circumstances, should reasonably have been foreseen. *Elder v. Fisher*, 247 Ind. 598, 217 N.E.2d 847 (1966). However, the specific manner in which injury occurs or the extent of the harm need not be foreseen if it can be reasonably anticipated that conduct will cause injury in substantially the manner in which it occurs. *Tabor v. Continental Baking Company, supra.* Thus, if the defendant's negligence is a substantial factor in producing plaintiff's injury, and if the particular injury suffered is one of a class that was reasonably foreseeable at the time of the defendant's wrongful act, then there is causal relation in fact as well as legal cause. *Johnson v. Bender, supra.* Consequently, the defendants in the present case are liable for the foreseeable damages which the Allen County Bank incurred as a result of the defendants' breaches of duty while they were directors of the Allen County Bank.

At this point a discussion of the duty of care of bank directors and the general rules regarding the burden of proof in suits against bank directors is appropriate. The degree of care to which bank directors are bound is that which ordinarily prudent and diligent men would exercise under similar circumstances. *Briggs v. Spaulding*, 141 U.S. 132, 11 S.Ct. 924, 35 L.Ed. 662 (1891). Each case in which it is sought to charge directors with liability must be determined in view of all the circumstances of that particular case. *Id.* Directors are charged with the duty of reasonable supervision over the affairs of the bank. It is their duty to use ordinary diligence in ascertaining the condition of the bank's business, and to exercise reasonable control and supervision over the bank's affairs. *Gallin v. National City Bank*, 152 Misc. 679, 273 N.Y.S. 87 (1934). However, the directors are not insurers or guarantors of the fidelity and proper conduct of the executive officers of the bank, and they are not responsible for losses resulting from their wrongful acts or omissions, provided they have exercised ordinary care in the discharge of their own duties as directors. *Id.* Ordinary care means that degree of care which ordinarily prudent and diligent men would exercise under similar circumstances. *Id.*

Furthermore, all of the directors of a bank have a duty to be generally familiar with the business and financial condition of the bank, and to devote a sufficient amount of time and energy to overseeing the affairs of the bank to allow them to discharge their responsibilities to the depositors and shareholders. It is the duty of the directors to attend meetings of the Board of Directors and to read the reports which are made to the bank by the FDIC and state bank examiners. *Bowerman v. Hamner*, 250 U.S. 504, 39 S.Ct. 549, 63 L.Ed. 1113 (1919); *Atherton v. Anderson*, 99 F.2d 883 (6th Cir.1938); *Francis v. United Jersey Bank*, 87 N.J. 15, 432 A.2d 814 (1981); *Neese v. Brown*, 218 Tenn. 686, 405 S.W.2d 577 (1964); *Kavanaugh v. Gould*, 223 N.Y. 103, 119 N.E. 237 (1918); *Coddington v. Canaday*, 157 Ind. 243, 61 N.E. 567 (1901). Consequently, it is not a defense that the directors did not know of unsound practices of the bank, if by devoting a reasonable amount of time and energy to the affairs of the bank they would have obtained such knowledge. Likewise, a director's duty to exercise due care, skill, and diligence in overseeing the affairs of the bank cannot be met solely by relying on other persons. Each director

has a non-delegable duty to the depositors and shareholders of the bank to exercise his own independent judgment, skill, care, and diligence in overseeing the affairs of the bank. *Fitzpatrick v. FDIC*, 765 F.2d 569 (6th Cir.1985); *Kavanaugh v. Gould*, 223 N.Y. 103, 119 N.E. 237 (1918); *Coddington v. Canaday*, 157 Ind. 243, 61 N.E. 567 (1901).

The general rule with respect to the burden of proof in suits against bank directors was clearly stated in *Anderson v. Akers*, 7 F.Supp. 924, 928 (W.D.Ky.1934):

It must, of course, always be borne in mind that the burden of proof rests upon the plaintiff as to each defendant and as to each of the elements necessary to a recovery of damages by the plaintiff. For example, it cannot be presumed that any of the defendant directors acted dishonestly or carelessly; that any of the loans made by this bank were, when made, or afterwards became, improper; that, because such loans eventually resulted in loss to the bank, they were improvident at the time when they were made; that, because one or more of the officers of the bank were dishonest, other officers thereof also were dishonest; or that because such an officer was dishonest, his associates knew of such dishonesty.

However, when a bank director approves a transaction between the bank and another institution in which he has an interest, the law presumes that the transaction is a breach of the director's duty of loyalty and good faith to the bank. Consequently, in such a case the burden of proof is on the director to prove that he did not breach his duty of loyalty and good faith. In order to carry that burden of proof, the director must prove that the transaction with the institution in which he has an interest was fair and reasonable to the bank. *Corsicana National Bank v. Johnson*, 251 U.S. 68, 40 S.Ct. 82, 64 L.Ed. 141 (1919); *Lewis v. S.L. & E., Inc.*, 629 F.2d 764 (2d Cir. 1980); *United Founders Life Ins. Co. v. Consumers National Life Ins. Co.*, 447

F.2d 647 (7th Cir.1971); *Neese v. Brown*, 218 Tenn. 686, 405 S.W.2d 577 (1964); *Shlensky v. South Parkway Building Corp.*, 19 Ill.2d 268, 166 N.E.2d 793 (1960); *Schemmel v. Hill*, 91 Ind.App. 373, 169 N.E. 678 (1930). Nevertheless, in an action against bank directors, the evidence on the issue of whether a particular transaction was fair and reasonable to the bank must be viewed in the time frame in which the directors were making their decisions. In other words, the court will not give the FDIC the benefit of hindsight. *Briggs v. Spaulding*, 141 U.S. 132, 11 S.Ct. 924, 35 L.Ed. 662 (1891); *Gallin v. National City Bank*, 152 Misc. 679, 273 N.Y.S. 87 (1934).

Having set forth these principles, the court will now determine each of the defendant's liability for the losses on the Abbott Coal lease and loan, the two Conn loans, and the three DeVries loans. All seven of the defendants were members of the Board of Directors when the Allen County Bank purchased the Abbott Coal lease and loan [21]. Ed Stanley was president of the Bank when the lease and loan were purchased. From March 1982 through May 1984, defendants Ed Stanley, Judith Stanley, and David DeHart were directors of the Leiters Ford State Bank, the Counting House Bank, and the Western State Bank, as well as the Allen County Bank. Defendant Marcuccilli, as well as being a director of the Allen County Bank, was also a director of the Counting House Bank and the Western State Bank, and was a director of Leiters Ford State Bank until January 1983. Marcuccilli was also Chairman of the Board of the Counting House Bank when the Allen County Bank purchased the Abbott Coal lease and loan. Additionally, Ed Stanley and Marcuccilli were vice-presidents of Northern Indiana Leasing.

As the court discusses the extent of the duty of care placed upon these defendants, as directors of the Allen County Bank, each defendant's status, vis-a-vis the institutions from which the respective loans and lease were purchased, will be noted. However, as will be seen below, the defendants' sta-

---

**21.** The Allen County Bank purchased the Abbott Coal lease on December 30, 1982 and the Bank purchased the Abbott Coal loan on February 12, 1983.

tus as "interested" or "non-interested" directors with respect to these transactions is ultimately immaterial.

■ First, as to the Abbott Coal lease, Ed Stanley and Marcuccilli were both "interested directors" because they were vice-presidents of Northern Indiana Leasing when Northern Indiana Leasing sold the lease to the Allen County Bank. Thus, as to this lease, Ed Stanley and Marcuccilli bear the burden of proving that they did not breach their duty of loyalty and good faith to the Allen County Bank. The court finds that Ed Stanley and Marcuccilli did not carry their burden of proof because they did not prove that the transaction with Northern Indiana Leasing was fair and reasonable to the bank. The evidence showed that Northern Indiana Leasing had purchased the bulldozer, which was the subject of the Abbott Coal lease, for $95,500 and that Northern Indiana Leasing then sold the lease to the Allen County Bank for the net amount of $110,500. Thus, Northern Indiana Leasing "earned" a $15,000 profit on the sale of the bulldozer lease. This transaction was not fair and reasonable to the Allen County Bank and defendants Ed Stanley and Marcuccilli clearly breached their duty of loyalty and good faith.

The other defendants, Judy Stanley, Dan Stanley, David DeHart, Gilbert Bierman, and John Boley, were not "interested directors" as far as the Abbott Coal lease is concerned. However, each of these defendants was bound to exercise that degree of care which ordinarily prudent and diligent men would exercise under similar circumstances. Defendant Bierman, who last attended an Allen County Bank board meeting on October 5, 1982, vigorously argues that he "effectively resigned" on October 5, 1982. Bierman thus claims that he cannot be held liable for any loans that the Allen County Bank's Board of Directors made after October 5, 1982. Bierman's claim is unpersuasive for several reasons.

■ First, although Bierman did not attend any board meetings after October 5, 1982, Bierman received "committee fees" from the Allen County Bank, totalling $2,400.00, for the months of October 1982

through February 1983. Thus, the Allen County Bank paid Bierman to serve as a board member, and he was not a mere "figurehead". Second, Bierman was re-elected as a board member, both on March 24, 1982 and on March 29, 1983, at the annual stockholders' meeting for those years. Clearly, if Bierman did not intend to participate as a board member during those years, he should have informed the stockholders that he did not wish to be re-elected. By allowing his name to remain on the election ballot each year, Bierman permitted the stockholders to believe that he was involved in the day-to-day activities of the Bank. Third, Ed Stanley testified that if a board member "totally objected" to a loan, the board members "weren't going to cram anything down anybody's throat." This testimony evidences that if Bierman had attended board meetings and objected to the Abbott Coal loan being purchased, he could have successfully prevented the Allen County Bank from making the purchase.

Finally, Bierman's claim that he cannot be held liable for actions taken by the board of directors during the time Bierman did not attend any meetings is contrary to the case law. The law clearly establishes that a director of a bank has the duty to attend directors' meetings. Bierman, as a member of the Allen County Bank Board of Directors, had a non-delegable duty to the depositors and shareholders of the bank to exercise his own independent judgment, skill, care, and diligence in overseeing the affairs of the Bank. Consequently, the court finds that defendant Bierman is liable for the losses which the Allen County Bank suffered on the Abbott Coal lease.

Defendant John Boley attended only two board meetings from March 1982 through May 1983. Boley attended two meetings in October of 1982, and one meeting in June of 1983 at which he tendered his resignation effective June 16, 1983. Thus, insofar as Boley claims that he cannot be held liable for the losses incurred on Abbott Coal lease for the reason that he did not attend board meetings, the case law referred to above applies and Boley cannot

escape liability merely because he was not involved in the Abbott Coal transactions. The court finds that defendant Boley is liable for the Bank's losses on the Abbott Coal lease.

With respect to the Abbott Coal lease, the remaining three defendants, David De-Hart, Dan Stanley, and Judy Stanley were outside directors (directors who did not have an interest in Northern Indiana Leasing) who regularly attended the directors' meetings. These board members knew or should have known of the low banking quality of the Abbott Coal lease and had a duty, as prudent bank directors, to exercise reasonable control and supervision over the bank's affairs. This duty was heightened by the fact that these defendants knew or should have known of Ed Stanley's and Robert Marcuccilli's interest in the Abbott Coal transactions. By allowing the Allen County Bank to purchase the Abbott Coal lease, David DeHart, Dan Stanley, and Judy Stanley breached their duty to the Bank and are thus liable for losses incurred on the lease.

■ With respect to the Abbott Coal loan, which was purchased from the Counting House Bank, Ed Stanley, Judy Stanley, David DeHart, and Robert Marcuccilli were "interested directors." These defendants served as directors of the Counting House Bank at the time the Allen County Bank purchased the Abbott Coal loan from the Counting House Bank. As "interested directors", these defendants bear the burden of proving that the purchase of the loan was fair and reasonable to the Allen County Bank. The court finds that these four defendants did not meet their burden. The loan transaction was patently unfair to the Allen County Bank because the Counting House Bank had failed to secure the collateral for the loan. The two loaders which were pledged as security for the loan were subject to a blanket lien as early as July 1981. The Counting House Bank did not file a security agreement on the loaders until March 1, 1983, more than two weeks after the Allen County Bank had purchased the loan.

■ Defendant Dan Stanley was an outside director who regularly attended meetings. Consequently, Dan Stanley knew or should have known of the unsound quality of the Abbott Coal loan. He had a duty, as a prudent director, to require the Allen County Bank to perform a UCC search on the collateral for the loan prior to purchasing the loan. Dan Stanley clearly breached this duty. Likewise, defendants Bierman and Boley, as noninterested directors who did not attend meetings, had a duty to be familiar with the actions of the Bank and to inquire into the quality of loans which the Bank was purchasing. Boley and Bierman failed to carry out their duties and are thus liable for the losses incurred on the Abbott Coal loan. As noted earlier in connection with the Abbott Coal lease, defendants Bierman and Boley cannot escape liability merely because they did not attend meetings and arguably did not know that the Bank was making this loan.

In summary, all seven of the defendants are jointly and severally liable on both the Abbott Coal lease and the Abbott Coal loan for the reason that the defendants failed to prudently carry out their duties as directors of the Allen County Bank causing the Bank to incur losses.

■ All of the defendants, except John Boley who resigned effective June 16, 1983, were also members of the Board of Directors when the Allen County Bank participated in the first Conn loan on June 24, 1983. Likewise, all of the defendants except John Boley were members of the Board of directors on July 19, 1983, when the Allen County Bank participated in the second Conn loan. Ed Stanley was president of the Allen County Bank when the loans were participated in. Ed Stanley, Judith Stanley, and David DeHart were directors of the Leiters Ford State Bank when the Leiters Ford State Bank entered into the participation agreement with the Allen County Bank. Thus, as to the two Conn loans, Ed Stanley, Judith Stanley, and David DeHart were "interested directors" because they were directors of both the Leiters Ford State Bank and the Allen

County Bank. Consequently, these defendants bear the burden of proving that they did not breach their duty of loyalty and good faith to the Allen County Bank. The court finds that Ed Stanley, Judith Stanley, and David DeHart did not carry their burden of proof because they did not prove that the transactions with Leiters Ford State Bank were fair and reasonable to the Allen County Bank.

The evidence showed that at the time the Allen County Bank participated in the Conn loans, the conns were carrying an extremely heavy debt load, with a debt-to-net worth ratio of at least 2.23 to 1. Further, the Conns had suffered a large net loss in the previous year and were unable to obtain assistance from the FHA, the lender of last resort, as late as March of 1983. And finally, the loans were undersecured because of the Bank's act of subordinating its liens on the Conn's crops to the input lenders. Participation in the Conn loans was not fair and reasonable to the Allen County Bank and defendants Ed Stanley, Judith Stanley, and David DeHart clearly breached their duty of loyalty and good faith.

The other defendants, Gilbert Bierman, Robert Marcuccilli, and Dan Stanley, were not "interested directors" as far as the two Conn loans are concerned. However, each of these defendants were bound to exercise that degree of care which ordinarily prudent and diligent men would exercise under similar circumstances. Defendant Bierman last attended Board of Director meetings on October 5, 1982. As noted in connection with the Abbott Coal transactions, Bierman argues that he "effectively resigned" on October 5, 1982 and cannot be held liable for any loans that the Allen County Bank's Board of Directors made after October 5, 1982. However, the court finds Bierman's argument unpersuasive for the reasons set out above in the court's discussion of the Abbott Coal transactions. Consequently, Bierman is liable for the losses which the Allen County Bank suffered on the Conn loans.

The remaining two defendants, Robert Marcuccilli and Dan Stanley, were outside directors (directors who did not have an interest in Leiters Ford State Bank) who regularly attended the directors' meetings. These board members knew or should have known of the low banking quality of the Conn loans and had a duty, as prudent bank directors, to exercise reasonable control and supervision over the bank's affairs. This duty was heightened by the fact that these defendants knew or should have known of Ed Stanley's, Judy Stanley's, and David DeHart's interest in the Leiters Ford State Bank. By allowing the Allen County Bank to participate in the two Conn loans, Robert Marcuccilli and Dan Stanley breached their duty to the Bank and thus are liable for losses incurred on the two loans.

Defendant John Boley attended only two board meetings from March 1982 through May 1983. Boley attended two meetings in October of 1982 and one meeting on June 14, 1983 at which he tendered his resignation effective June 16, 1983. Boley was not a member of the Board of Directors on June 24, 1983, the date the Allen County Bank participated in the first Conn loan and Boley also was not a director at the time the second Conn loan was participated in, July 19, 1983. Therefore, there is no basis for holding him liable for the losses incurred on these loans[22].

With respect to the three DeVries loans, all seven of the defendants were members of the Board of Directors when the Allen County Bank purchased or participated in these loans. Ed Stanley was president of the Allen County Bank when the loans were purchased or participated in. Ed Stanley, Judith Stanley, and David DeHart were directors of the Leiters Ford State Bank when the Leiters Ford State Bank entered into the three transactions with the Allen County Bank. Thus, as to the three DeVries transactions, Ed Stanley, Judith Stanley, and David DeHart were "interested directors" because they were

---

**22.** See this court's order of December 4, 1989 granting Boley's motion for summary judgment with respect to the two Conn loans.

directors of both the Leiters Ford State Bank and the Allen County Bank. Consequently, these defendants bear the burden of proving that they did not breach their duty of loyalty and good faith to the Allen County Bank. The court finds that Ed Stanley, Judith Stanley, and David DeHart did not prove that the transactions with Leiters Ford State Bank were fair and reasonable to the Allen County Bank and thus they are liable for the losses which the Allen County Bank suffered on the three DeVries transactions.

The other defendants, Robert Marcuccilli, Dan Stanley, Gilbert Bierman, and John Boley, were not "interested directors" as far as the three DeVries loans are concerned. However, each of these defendants were bound to exercise that degree of care which ordinarily prudent and diligent men would exercise under similar circumstances. By allowing the Allen County Bank to enter into the three DeVries transactions, Robert Marcuccilli, Dan Stanley, Gilbert Bierman, and John Boley breached their duty to the Bank and thus are liable for losses incurred on the three loans.

In summary: Ed Stanley, Dan Stanley, Judith Stanley, Marcuccilli, DeHart, Bierman and Boley are all jointly and severally liable for the Allen County Bank's losses on both of the Abbott Coal transactions; Ed Stanley, Dan Stanley, Judith Stanley, Marcuccilli, DeHart, and Bierman are all jointly and severally liable for the Allen County Bank's losses on both of the Conn loans; and Ed Stanley, Dan Stanley, Judith Stanley, Marcuccilli, DeHart, Bierman, and Boley are all jointly and severally liable for the Allen County Bank's losses on the three DeVries transactions.

The FDIC has established that the Allen County Bank suffered the following losses through December 6, 1989 (total principal and interest): Abbott Coal loan, $69,034.08; Abbott Coal lease, $59,254.46; Conn loan No. 1, $21,767.91; Conn loan No. 2, $125,-865.70; Sidney DeVries, $59,122.78; DeVries Hog & Grain Farm, Inc. loan No.

1, $26,617.80; and DeVries Hog & Grain Farm, Inc. loan No. 2, $133,242.65. These losses total $494,905.38. Interest on these loans is $118.41 per diem from December 6, 1989 to the date of this judgment. The FDIC has further established that the Allen County Bank has incurred $10,042.08 in expenses with respect to the Abbott Coal transactions [23]. Thus the FDIC's total recovery in this action is $574,809.36.

Accordingly, the court concludes that the defendants Ed Stanley, Dan Stanley, Judith Stanley, Marcuccilli, DeHart, Bierman, and Boley are all jointly and severally liable, for principal and interest to date, as follows:

| | |
|---|---|
| Abbott Coal loan | $ 78,084.68 |
| Abbott Coal lease | 64,989.26 |
| Sid DeVries | 67,642.38 |
| DeVries loan No. 1 | 32,930.80 |
| DeVries loan No. 2 | 151,910.25 |
| Abbott Coal fees | 10,042.08 |
| | $405,599.45 |

Furthermore the court concludes that the defendants Ed Stanley, Dan Stanley, Judith Stanley, Marcuccilli, DeHart, and Bierman are all jointly and severally liable, for principal and interest to date, as follows:

| | |
|---|---|
| Conn loan No. 1 | $ 24,918.51 |
| Conn loan No. 2 | 144,291.40 |
| | $169,209.91 |

## CONCLUSION

It is hereby ORDERED, ADJUDGED, and DECREED that the defendants, Ed Stanley, Dan Stanley, Judith Stanley, Marcuccilli, DeHart, Bierman, and Boley are all jointly and severally liable to the FDIC in the amount of $405,599.45, and the defendants, Ed Stanley, Dan Stanley, Judith Stanley, Marcuccilli, DeHart, and Bierman are all jointly and severally liable to the FDIC in the amount of $169,209.91.

---

23. The defendants have not contested the actual amount of losses nor have they provided the court with an alternative calculation of damages.